IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE J. WERT and | ) | |
| RICHARD D. KINCAID, | ) | |
| | ) | |
|     Plaintiffs, individually and on | ) | |
|     behalf of all shareholders | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | Judge |
| STUART COHN, ZVI FEINER, | ) | |
| DAVID JONATHAN ROSENBERG, SCOTT | ) | **JURY TRIAL DEMANDED** |
| APPLEBY, and AVI FOX, | ) | |
| | ) | |
|     Defendants. | ) | |

## COMPLAINT

NOW COME Plaintiffs Lawrence J. Wert and Richard D. Kincaid, individually and on behalf of all shareholders, by and through their attorneys, and for their Complaint against Defendants Stuart Cohn, Zvi Feiner, David Jonathan Rosenberg, Scott Appleby, and Avi Fox, state as follows:

## SUMMARY OF THE ACTION

1.    This is an action brought on behalf of Plaintiffs and on behalf of all shareholders of Ditto Holdings Corporation[1] ("Ditto Holdings" or the "Company"), a Delaware corporation, by two individuals who invested hundreds of thousands of dollars, seeking damages for Defendants' material misrepresentations and omissions in violation of the federal securities laws; fraud as to Plaintiffs and shareholders; negligent misrepresentation; legal malpractice; and wrongful breach of their fiduciary duties to Plaintiffs, the Company, and the Company's other shareholders.

2.    Plaintiffs invested in the Company because Defendants led them to believe that

---

[1] As explained further below, Ditto Holdings later changed its name to SoVesTech.

they would be investing in an exciting new online trading company that utilized proprietary, cutting-edge technology in order to allow individuals to attach to the actual trades of "lead investors."  This technology would allow customers to have the lead trader's trades automatically executed in their trading accounts according to personal pre-set parameters, or they could have trade alerts texted to their mobile phones so they could act on them at their own discretion.

3.      Plaintiffs held on to their initial investments in Ditto Holdings and invested additional funds in reliance upon statements made by and/or approved by Defendants concealing the true financial condition of Ditto Holdings and neglecting to inform investors of the unconscionable and catastrophic mismanagement of investors' funds by insiders, including Avi Fox and other members of his family.  This mismanagement, corporate waste and, indeed, complete disregard of the corporate form was known to Defendants, who failed to act with the loyalty and care that they owed to Plaintiffs, the Company, and its other shareholders as officers and directors.

4.      Defendants' breaches of their fiduciary duties to Plaintiffs, the Company, and its other shareholders have resulted in the complete failure of the Company and the endangerment and loss of vital Company assets.  Defendants' fraudulent and misleading representations, breaches of fiduciary duty, corporate waste, and legal malpractice have imperiled Plaintiffs' substantial investments in the Company.  Plaintiffs bring their claims on behalf of themselves and, in certain instances, also on a derivative basis on behalf of the Company, for the benefit of the other shareholders.

## **PARTIES**

5.      Plaintiffs Lawrence Wert and Richard Kincaid are citizens of Illinois.  Mr. Wert and Mr. Kincaid both reside in Cook County, Illinois.

6.　　Defendant Stuart Cohn is a citizen of Illinois. Upon information and belief, Stuart Cohn resides at 505 Provident Avenue, Winnetka, Illinois 60093. He is a licensed attorney in the State of Illinois, and, from 2010 until at least January 2016, he was the General Counsel of the Company. He also served as Secretary of the Company for at least part of that period. Mr. Cohn is also a Certified Public Accountant.

7.　　Defendant Zvi Feiner is a citizen of Illinois. Upon information and belief, Zvi Feiner resides at 2900 West Farwell Avenue, Chicago, Illinois 60645. He became a member of the Company's Board of Directors in 2013.

8.　　Defendant David Jonathan Rosenberg is a citizen of Illinois. Upon information and belief, David Jonathan Rosenberg resides in Cook County, Illinois. He has been a member of the Board of Directors of the Company since at least 2012. He also served as Chief Compliance Officer for the Company from 2009 to the present.

9.　　Defendant Scott Appleby is a citizen of Connecticut. Upon information and belief, Scott Appleby resides at 3 Indian Trail, Darien, Connecticut, 06820. He was a member of the Board of Directors of the Company for a period beginning in approximately 2009 and ending in 2013.

10.　　Defendant Avi Fox is a citizen of California. Upon information and belief, Avi Fox resides at 352 Maple Drive, Beverly Hills, California 90212. He was one of the original members of the Company's Board of Directors, along with his brother, Yosef Yehuda Fox, also known as Joseph Fox. Avi Fox left the Company's Board of Directors in 2012.

## JURISDICTION AND VENUE

11.　　This Court has jurisdiction over Count I because it arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they arise out of a

common nucleus of operative fact with the claim set forth in Count I. The amount in controversy is no less than $75,000 and could extend to tens of millions of dollars.

12. This Court may exercise personal jurisdiction over Defendants Feiner, Cohn, and Rosenberg because they reside in the State of Illinois, have sufficient contacts with this state, and have purposefully availed themselves of the benefits and protections of the laws of the State of Illinois such that the exercise of personal jurisdiction over them will not deprive them of due process of law or offend traditional notions of fair play and substantial justice.

13. This Court may exercise personal jurisdiction over Defendants Avi Fox and Scott Appleby because their acts described herein were committed in their capacities as officers and directors of a corporation whose principal place of business is located in the Northern District of Illinois, such that the exercise of personal jurisdiction over them will not deprive them of due process of law or offend traditional notions of fair play and substantial justice. Further, Defendant Avi Fox has availed himself of the protections of the laws of Illinois by pursuing Case No. 2016-L-011757 in Cook County Circuit Court.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all or a substantial part of the events or omissions giving rise to the claims in this action took place in the Northern District of Illinois. Venue is proper under Section 27 of the Securities Exchange Act of 1934 because the alleged wrongful conduct in part took place in this district.

## GENERAL ALLEGATIONS

### Background

15. Avi Fox and his brother Joseph Fox started their first online trading venture, Web Street Securities, in 1996. Web Street Securities went public in 1999, and the Fox brothers sold it to E*Trade in exchange for stock in 2001.

16.     The Fox brothers drifted through a series of failed ventures during the next several years, including a planned comedy television channel and a real estate venture (called Buyside Realty and, later, Iggy's House).

17.     In early 2009, Avi Fox and Joe Fox incorporated a business called Chicago Commodities Exchange, Inc., which did business as FreeGoldScale.com.  This business sent scales to customers, who could weigh their gold jewelry and other items containing gold, calculate the worth of the gold on a table provided by FreeGoldScale.com, and send the items in for payment, after which FreeGoldScale.com would have the items smelted and receive payment for them.

18.     In April 2009, Chicago Commodities Exchange engaged in a private placement offering of shares to investors.  The required Form D was not filed until 18 months after this sale.

19.     Apparently desiring to get back into the brokerage business, upon information and belief, in or around August 2009, Avi and Joseph Fox worked with a California trader named Brian Lund to develop a concept in which individual investors could follow and, if they wished to, "mimic" the trades of an experienced "lead trader."

20.     Chicago Commodities Exchange, Inc. changed its named to FB Financial Group, Inc. on or about August 26, 2009.

21.     In September 2009, the Fox brothers formed FB Securities Corp.

22.     In December 2009, FB Securities Corp. changed its name to Ditto Trade, Inc. ("Ditto Trade").[2]

23.     In July 2010, Joseph Fox moved to Los Angeles, California, and Ditto Trade's

---

[2] Ditto Trade, Inc. had been incorporated under the laws of Illinois on September 21, 2009.

offices were moved there as well. That same month, Ditto Trade was registered with the Securities and Exchange Commission ("SEC") as a broker/dealer.

24.     In October 2010, Ditto Trade began live beta testing of its technology.

25.     On December 28, 2010, the Fox brothers incorporated Ditto Holdings, Inc. under the laws of Delaware. Ditto Holdings would serve as the holding company that would be the 100% owner of Ditto Trade.[3]

26.     On that same day, there was a resolution of the Ditto Holdings Board of Directors appointing Joseph Fox as Chief Executive Officer and President of Ditto Holdings, Avi Fox as Treasurer, Stuart Cohn as Secretary, and Jeremy Mann as Assistant Secretary. This resolution gives the officers the right to pay all "organizational, legal and other expenses of the Corporation out of the funds of the Corporation." As will be explained below, this provision was rampantly abused by Fox family members, all under the watch of Rosenberg (Chief Compliance Officer), Cohn (General Counsel and Secretary), and other officers and Board members, who did nothing to stop it.

**Financial Mismanagement of the Company and Complete Lack of Adherence to Corporate Form**

27.     Joseph Fox and Avi Fox had "Employment Agreements" with Ditto Holdings that enabled them to evade taxation as well as any other measure of accountability for their actions.

28.     The purported terms of the Employment Agreements are: the Fox brothers were to be "advanced" up to $250,000 per year.[4] Joseph Fox kept track of how much was spent during a given year and the reasons for each expenditure "in his head," as he stated in testimony

---

[3] FB Financial Group, Inc. was merged into Ditto Holdings on May 1, 2011, with Ditto Holdings emerging as the surviving entity.

[4] Rosenberg purportedly also had an Employment Agreement with similar terms and an annual cap of $100,000.

before the SEC and the Financial Industry Regulatory Authority ("FINRA"). There was an alleged option to treat these advances as wages if the Company obtained $5 million in contributed capital within five years, a goal that, Joseph Fox claims, the Company met. There was also an alleged option to treat the advances as loans from the Company which would have to be repaid.

29. It is unclear how these advances were ultimately treated for tax purposes (if at all). Some of Joseph Fox's "advances" were actually paid to his wife and other family members, thus making classification even more difficult. It became apparent in the course of the SEC and FINRA investigations into the Company that no general ledger was kept for the Company between 2009 and 2012, and it is questionable whether one was ever kept.

30. No Ditto Holdings officer or director received a W-2, IRS Form 1099, or Schedule K-1 (Form 1065) between at least 2009 and 2012, because virtually all compensation was in the form of these fictitious advances either to be converted to income or treated as loans to be paid back at a later, unspecified date. The officers and directors, especially Secretary/General Counsel Cohn, knew or should have known that the Company was not complying with applicable tax laws in its compensation structure. The directors did not, however, disclose this fact to Plaintiffs or current or prospective shareholders, making it impossible for them to make informed decisions about investing in the Company.

31. It is unclear whether these Employment Agreements were committed to writing in 2009 or much later, in a retroactive attempt to justify the massive number of questionable expenditures. Regardless of when these agreements were written, the Company's officers and directors knew or should have known that there was no legitimate basis for the way Joseph Fox and his family spent shareholder funds without regard for proper accounting or tax treatment: if

these advances were income, they had to be recognized as such; if they were loans, they had to be properly documented, accounted for by the Company, and repaid. The officers and directors never disclosed to Plaintiffs or current or prospective shareholders that Joseph Fox and his family members were using shareholder funds for their own personal use (and flaunting accounting and tax rules in the process) so that they could make informed decisions about investing in the Company.

32.     There was no single corporate bank account for the Company. Rather, a succession of accounts was utilized, including a Los Angeles-based Bank of America account with an account number ending in -71804 (the "B of A Account") and a Chicago-based U.S. Bank account ( the "U.S. Bank Account") with an account number ending in -7622. Signatories on these accounts included Chief Financial Officer Jeremy Mann and Joseph Fox's son, Jorden. In testimony before various regulatory bodies, Joseph Fox has claimed that Jorden Fox had some role with the Company, the precise nature of which is unclear. Plaintiffs have not been able to review complete records for all Company accounts, but those records that are available reveal troubling patterns of spending.

33.     Joseph Fox, who was unable to open bank accounts himself due to credit problems, received debit cards for these Company accounts. He then proceeded to use these accounts as a private ATM for himself and his family.

34.     A review of the monthly statement for the B of A Account from March 2012, for example, shows $1,000, $1,200, and $1,500 wires (at a $25.00 fee per wire) to Joseph Fox's brother Yitzhok Fox and two $1,000 and three $500 wires (also at $25.00 per wire) to his wife Lauren Fox. Joseph Fox later claimed that any payments (which ultimately totaled approximately $58,000) made to his wife were really just "advances" to him under his

8

Employment Agreement, but he has never adequately explained why such payments needed to go through his wife. These payments were not declared as income by Joseph Fox. There is also a $2,200 payment to a medical office in Los Angeles and a cash withdrawal of $2,500 for which no reason is listed. There are two payments to LA Dogworks (whose website proclaims that it is "Internationally recognized as one of the best dog care centers in the world."). There are large wires to ($40,000) and from ($24,000) another Ditto Holdings account held at Citibank.

35.     The July 2012 B of A statement reveals a $10,000 wire to "Savaged: The Movie," an independent film project produced by Jorden Fox. This is one of many unexplained payments to Jorden's production company, which shared an address with the Company's offices in Los Angeles. Approximately $170,000 in Company funds was spent on Jorden Fox, including his personal rent. The July B of A statement also features several large withdrawals at Las Vegas casinos; the Company had no legitimate business activities in Las Vegas. At least $46,000 of Company funds was spent in Las Vegas.

36.     Several B of A statements reflect wires coming in from investors (including funds wired from the investors' Individual Retirement Accounts; in one month, over $1 million in shareholder funds was wired directly to the B of A Account), being intermingled with the funds already in the account, and then being spent in the typical pattern described herein (wires to Fox family members, Las Vegas trips, etc.).

37.     The U.S. Bank Account was used for incoming wires from investors at least throughout 2013. Hundreds of thousands of dollars came in from individual investors; these funds were commingled with existing funds and then subjected to the usual mix of ATM withdrawals, medical bill payments, rent and other payments.

38.     This mishmash of payments, with no contemporaneous general ledger to assist in

9

finding any semblance of corporate justification for the entries, shows no regard for the corporate form or for the Company's well-being. In clear breach of their fiduciary duties to Plaintiffs, the Company, and its shareholders, the Company's Board and officers, including Rosenberg and Cohn, enabled and authorized the Fox family's pillaging of Company funds.

39. Encouraged by Joseph Fox, individual employees and shareholders would randomly loan the Company money to meet payroll and pay insurance premiums on an as-needed basis. Some of these "loans" were undocumented. According to his FINRA testimony, CFO Jeremy Mann and his parents, for example, routinely fed money to the Company to meet payment deadlines, including via credit card.

40. Current and potential investors in the Company were not made aware of the Company's chaotic spending practices and complete lack of accounting protocol. When investors requested documentation of the Company's financial condition, they were supplied with projections rather than historical figures. In order to conceal the improprieties being perpetrated at the holding company level, Joseph Fox would furnish investors with actual financial performance information pertaining to the broker/dealer subsidiary Ditto Trade, which was under stringent regulatory reporting requirements. When asked by FINRA in 2013 why he never told investors that Ditto Holdings had never filed a tax return, Joseph Fox stated only that "if anybody would have asked, I absolutely would have told them."

41. None of the Company's securities offerings were properly registered with the SEC, nor were they exempt from registration as claimed by the Company. Rather than complying with the SEC requirement that registration documents be filed within fourteen (14) days of the date of the first sale of an offered security, the Company would often wait years before filing the requisite documents. Unbeknownst to Plaintiffs and other investors, while they

were investing in the Company's securities offerings, the proper paperwork had not been filed with the SEC. This vital failure is another example of the directors' and officers' (especially Secretary/General Counsel Cohn, who was the Company's chief legal officer and was or should have been aware of SEC regulations surrounding securities offerings) breach of their fiduciary duties to Plaintiffs and the Company's shareholders.

### Excessive Gambling by Joseph Fox and Jorden Fox

42. As the Board members knew or should have known, Joseph Fox and his son Jorden Fox are avid poker players who have participated in numerous professional tournaments, including several World Poker Tour events.[5]

43. According to the Global Poker Index ("GPI") website,[6] Joseph Fox (listed as "Yosef Fox") from Los Angeles, California played in twenty-six professional poker events between 2010 and 2015, including the No Limit Hold 'Em Main Event at the 2015 World Series of Poker in Las Vegas, at which he finished 100th, winning $46,890 after paying $10,000 to buy in, or enter, the tournament. All but two of these events took place in or around Los Angeles.

44. One of the events listed on Joseph Fox's GPI webpage is the Rio Daily Deepstacks 2012, which took place at the Rio Casino in Las Vegas on June 23, 2012. Joseph Fox played in the tournament, placing 49th and winning $877 after a buy-in of $235. The Company's Bank of America account records show nearly $10,000 in cash withdrawals, purchases, and check card transactions in Las Vegas between June 24 and 26, 2012. Multiple

---

[5] The World Poker Tour is a series of international poker tournaments, with an associated television series broadcasting the final table of each tournament.

[6] http://www.globalpokerindex.com/poker-players/yosef-fox-170324/

plane fares are also listed.  These bank records indicate that Joseph Fox was bankrolling his poker habit with Company funds.[7]

45.     Jorden Fox's GPI webpage reveals that he has played in at least twenty-two professional poker events between 2009 and 2016 in Los Angeles and Las Vegas.  Like his father, he has participated in the World Series of Poker in Las Vegas.

46.     These poker habits present very troubling issues for the Company and the Board. First, it is clear that Company money (meaning shareholder funds) was being spent by Joseph Fox and his family in Las Vegas in connection with their participation in professional poker tour events.   The total extent of such expenditures is unclear due to the incompleteness of relevant bank records and the Company's haphazard accounting practices.  Second, the sheer volume of events listed on the GPI website alone show that the man who was supposedly directing the Company was spending a great deal of his time focusing on his poker game, not on steering the Company in a manner that would benefit its shareholders.  Again, the extent of this diversion is not known; it is unknown, for example, whether Joseph Fox was participating in and wagering on online poker tournaments (as many poker enthusiasts do), which could represent even more Company funds expended and more time spent away from his duties as Company CEO.  Third, it is known that large amounts of Company money were given to Jorden Fox, either directly or through his movie production company.  How much of this money was used to support Jorden Fox's own poker habit is unclear.   Fourth, the plethora of Las Vegas entries on the Company's bank statements suggests that Joseph Fox and Jorden Fox were working on their gambling skills with Company money even when not participating in official events.  Fifth, the numerous Los

---

[7] There is no evidence that Joseph Fox has put any of his $186,753 in career professional poker earnings (as listed on his GPI webpage) back into the Company.

Angeles-area tournaments in which Joseph and Jorden Fox have participated suggests that Company funds may have been expended on gambling pursuits even outside Nevada.

47.     The Board knew or should have known that Joseph Fox was heavily involved in gambling, both in terms of time and expenditures of shareholder funds. The Board did nothing to stop the CEO's use of shareholder funds to support his gambling habit, nor did it disclose to Plaintiffs or to current or prospective shareholders that the CEO was using Company funds in this manner and/or that the CEO's focus was on gambling and poker and not on maximizing shareholder value.

### Joseph Fox Sells His Own Shares in the Company at Lower Prices Than the Company Itself Was Offering

48.     On May 5, 2012, Joseph Fox's personal residence in Long Grove, Illinois was foreclosed upon, indicating that he was having significant personal financial difficulties.

49.     In order to remedy his own precarious financial situation, in or about January 2013 Joseph Fox began offering his own shares of Company stock to potential investors at prices below what the Company was simultaneously offering to outside investors.[8] Joseph Fox did not properly register these sales with the SEC, nor did he provide adequate information about the investment to prospective purchasers, who purchased at least $1.2 million worth of these unregistered securities.

50.     Some of the investors who purchased Joseph Fox's personal shares in the Company were not accredited investors. Joseph Fox did not engage in adequate efforts, if any, to determine whether the purchasers of his personal shares were accredited or not. The SEC has determined that Joseph Fox acted wrongfully in selling his shares to persons who were not

---

[8] In 2013, the Company would also repurchase shares from other Fox family members, including Ari Fox, Yitz Fox, and Joseph Fox's mother Deborah, at prices lower than the Company was actively selling its own shares to outside investors at the time.

accredited or sophisticated investors without filing a registration statement or obtaining an exemption from registration.

51.     Even setting aside the lack of registration, sales to unaccredited investors, and inadequate investment information, this self-dealing clearly represented a conflict that was injurious to the Company, as these investors could, instead, have purchased Company stock at the higher prices otherwise being offered.  These sales of personal shares were not products of fair dealing, nor were they conducted at a fair price.

52.     As the chief legal officer of the Company, Cohn owed the shareholders a duty to prevent such obvious conflicts of interest from occurring.  He did nothing, nor did any other officer or board member act to stop the sale of Joseph Fox's personal shares and the obvious dangers to the Company attendant to such activities.

### Guarantees of Loans and Share Purchases

53.     Despite his precarious personal financial situation, Joseph Fox personally guaranteed several individuals' loans to the Company and/or purchases of Company stock.  He would guarantee, in writing, to pay back loans if the Company could not repay them, and, in some cases, he would guarantee to repurchase shares of Company stock purchased by investors after the expiration of a specified time period.  At least two shareholders have filed suit following Joseph Fox's failure to repurchase shares pursuant to such a guaranty agreement. Another shareholder loaned at least $300,000 to the Company supported by such a purported guarantee; this loan was never paid back.  Plaintiff Wert made a loan guaranteed by Joseph Fox that went unpaid until Wert sent a letter from an attorney to Joseph Fox.

54.     The Company extended a line of credit to Joseph Fox in the amount of $100,000 to allow him to make these personal guarantees.  This created an odd arrangement in which, for

example, the Company agreed to use its own funds to back supposed equity in itself, thus rendering the value of the equity questionable at best. This line of credit, secured by a promissory note from Joseph Fox, was approved by a "Resolution of Directors (Joseph and Avi Fox)" on May 1, 2012.

### The Whistle is Blown

55. On or about January 2, 2013, Paul Simons began work as the Chief Executive Officer of Ditto Trade and Executive Vice President of Ditto Holdings. He reported directly to Joseph Fox.

56. Simons was elected to the Board of Ditto Holdings in July 2013.

57. In or about late August 2013, while reviewing an updated Company share register, capitalization table, prospective shareholder buy-back list, and other related information in preparation for an investor meeting, Simons was alerted to the various questionable Company expenditures, sales of personal shares, accounting irregularities, and general corporate mismanagement outlined above.

58. On September 9, 2013, Simons presented a demand letter (the "Simons Letter") containing his concerns (in which Jeremy Mann and Company President Adam Stillman joined) to his fellow Board members (Joseph Fox and Rosenberg) and Secretary and General Counsel Cohn. A copy of this letter is attached hereto as **Exhibit A**.

59. Among the concerns raised in the Simons Letter are:

- Payments totaling approximately $170,000 to or on behalf of Jorden Fox relating to apartment rent, legal expenses, and the production of "Savaged the Movie";

- Payments to Joseph Fox of approximately $167,000 to or on behalf of Joseph Fox relating to the cost of his primary residence, personal car(s), insurance and utilities;

- Charges and cash withdrawals of almost $46,000 at various Las Vegas resorts and casinos when the Company had no legitimate business activities there;

15

- Payments to Fox family members with no indicated or apparent business purpose;

- Payments totaling $15,000 to a company owned by Cohn's son, Clayton[9];

- Joseph Fox's sales of his own stock, as well as sales of stock of other early investors;

- The Company's failure to file tax returns; and

- The Company's overall lack of appropriate internal controls or systems to record transactions.

(Simons Letter, Ex. A at pp. 1-2)

60.     Simons called for a special meeting of the Board of Directors and requested immediate adoption of resolutions calling for, *inter alia*, an internal investigation and independent audit of the financial histories and transactions of Ditto Trade and Ditto Holdings; removal of Jorden Fox as a signatory on Company accounts; immediate suspension of all capital raising activities; and Board approval of all Company or Ditto Trade expenditures in excess of $5,000 until the internal investigation was completed.  (*Id*. at pp. 2-3)

**Company's Response to the Simons Letter**

61.     The day after he submitted the Simons Letter, Simons was relieved of his duties and placed on leave.  Shortly thereafter, he was removed from the Company's Board and, two days later, he was fired.  Simons was replaced on the Board by Zvi Feiner.

62.     On September 13, 2013, FINRA began an investigation into the concerns raised by Simons, Mann, and Stillman.

63.     On or about September 16, 2013, Joseph Fox appointed Rosenberg as a one-person "Special Committee" to engage an independent law firm to investigate the allegations in the Simons Letter.  Rosenberg retained Goldberg Kohn to conduct this investigation.  Although

---

[9] Clayton Cohn has since been charged by the SEC with wire fraud in connection with a hedge fund he operated and, if convicted, he faces up to 20 years in prison.

Goldberg Kohn was ultimately critical of the Company's overall accounting and compensation practices, it accepted the vast majority of Joseph Fox's self-serving explanations for his questionable actions and expenditures. The directors therefore breached their fiduciary duty to Plaintiffs, the Company, and its shareholders by allowing Joseph Fox to appoint Mr. Rosenberg, a lifelong friend of Joseph Fox, to be solely responsible for retaining the professionals who would conduct an "independent" review of Joseph Fox's leadership of the Company.

64.     Joseph Fox hired temporary employees to work on identifying and categorizing the Company's expenses in anticipation of his FINRA deposition. Upon information and belief, these temporary workers were his son Jorden and his friends.

65.     Jeremy Mann was fired in November 2013. Joseph Fox later blamed Mann almost exclusively for the Company's shoddy bookkeeping in his SEC hearing and FINRA deposition.

66.     Adam Stillman was fired in December 2013.

67.     Goldberg Kohn completed its report on December 31, 2013, and issued it to the Company on January 29, 2014.[10] A copy of this report is attached hereto as **Exhibit B**.

### The Goldberg Kohn Report

68.     It is important to note that the Goldberg Kohn Report ("GK Report") was based upon limited information (documents, interviews, etc.) provided to Goldberg Kohn by the Company itself. As such, Goldberg Kohn was hamstrung by the constraints of the Company's shoddy bookkeeping and Joseph Fox's retroactive, self-serving explanations of his own actions and the questionable expenditures. Further, Goldberg Kohn emphasized that whether the actions of the Company and its officers and directors constituted securities violations, the determining

---

[10] In another example of the Company's complete lack of fiscal responsibility, Goldberg Kohn was never paid for its work in compiling the Goldberg Kohn Report, necessitating a lawsuit (Cook County Case Number 2015L001912). The Cook County Circuit Court recently entered summary judgment in favor of Goldberg Kohn for nearly $271,000.

bodies were the SEC and FINRA, not Goldberg Kohn. "Consequently, the lack of recommendations or comments on such matters should not be deemed to constitute any conclusions or recommendation with respect to such matters." (GK Report, Ex. B, at p. 2) Goldberg Kohn also emphasized that it gave no opinion on the tax implications of "the Company's failure to file annual tax returns and comply with applicable tax laws." (*Id*. at p. 6 n.1)

69.    Joseph Fox told the Goldberg Kohn investigative team that the Company's loose compensation structure was in the best interests of the Company because it "avoided the large fixed monthly costs of executives' and employees' salaries and benefits, deferred payment of payroll taxes and provided the Company with the flexibility to pay its people as and when funds were available." (*Id*. at p. 6)

70.    Joseph Fox told Goldberg Kohn that the payments to his family members were being treated by the Company as advances under his Employment Agreement. (*Id*. at p. 28) Goldberg Kohn accepted this explanation, finding that the expenditures were largely accounted for and "do not appear to involve acts of embezzlement by Joseph Fox." (*Id*.) Goldberg Kohn also accepted Joseph Fox's characterization of nearly $144,000 in cash withdrawals from Company bank accounts through bank tellers and ATMs, for which the Company recorded no contemporaneous purpose in any kind of general ledger, as being entirely attributable to payroll. (*Id*. at p. 37)

71.    Goldberg Kohn further accepted Joseph Fox's convoluted explanation that the payments to Jorden Fox's movie and to his production company were to be counted against the promissory note securing the $100,000 loan described above (that was ostensibly intended to make it possible for him to guarantee investor loans and stock purchases). (*Id*. at p. 30) Joseph

18

Fox also explained that the Company wired the payments to the movie and its production company to "save the steps of having the Company first pay Joseph Fox directly." (*Id*. at pp. 30-31)

72.     Despite its seeming acceptance of Joseph Fox's self-serving explanations for various irregularities, Goldberg Kohn delivered a strong conclusion to the Board about the Company's lack of corporate control:

> *The Company has been operating on an ad hoc undisciplined, nontransparent basis.* The Company has failed to maintain sufficient written records of expenditures and advances and did not contemporaneously document its payments or advances purportedly to have been paid or made on behalf of employees as wages. Furthermore, the concept of reimbursements for business expenses has been applied generously and loosely. The Company has failed to prepare or file tax returns which, although it had no taxable income, it nevertheless was legally required to file. *Joseph Fox, as Chief Executive Officer, has had broad unchecked authority and has unilaterally made decisions for the Company about how and when to use corporate funds*. . . . As the Company matured and raised millions of dollars through its private offerings, the Company should have transitioned more quickly than it did to more formal and disciplined business practices and procedures.

(GK Report at pp. 6-8) (emphasis added)

73.     The GK Report goes on to state "we do not condone operating a business in the manner in which it has been run to date." (*Id*. at p. 8)

### Company's Response to GK Report

74.      As part of his defense of a lawsuit filed in January 2014 by Paul Simons against Ditto Trade, Ditto Holdings, and himself, Joseph Fox disingenuously argued to the court that the GK Report contained "trade secrets." Importantly, this allowed the Company to keep the GK Report from being available to the public for several months while its supposed confidentiality was being contested in the court proceeding.

75.     In a February 2, 2014 email to shareholders signed by Company Board members Joseph Fox, Jonathan Rosenberg and Zvi Feiner, shareholders were told that the Board had

received the GK Report (which is not attached to the email), and, in bold print, that the report "does not find any dishonest business practices, nor did it find any misappropriation or misuse of company funds." (February 2, 2014 email to shareholders, attached hereto as **Exhibit C**). The email contains no mention of Goldberg Kohn's conclusion, quoted in paragraph 72 above, regarding the Company's lack of corporate discipline with respect to recordkeeping, payment of taxes, and Joseph Fox's dangerously unchecked authority.

76.     This omission, clearly authorized by the Board, as it is signed by all Board members, is intentionally misleading. The GK Report stops well short of absolving the Company for all of its transgressions. Further, the email falsely states that "we have already put in place many of the recommended improvements and controls." The GK Report made the following recommendations:

- **Establish and Comply with Good Corporate Practices**: Goldberg Kohn suggested that the Company adhere more closely to corporate formalities in the following areas:

    o   **Recordkeeping**: Goldberg Kohn recommended that the Company institute a formal recordkeeping system, preparing and maintaining detailed corporate books and records and a detailed and accurate General Ledger. The firm also recommended that the Company institute adequate oversight, responsibility and accountability measures to ensure good recordkeeping. (GK Report, Ex. B, at pp. 63-64);

    o   **Compensation**: Goldberg Kohn recommended that the Company implement more transparent and consistent compensation standards and pay its employees through regular payroll, payments, and practices. (*Id*. at p. 64) The firm further suggested not compensating family members to the extent they are not actively providing value or services to the Company. (*Id*.) The firm also suggested writing down all compensation agreements, conducting an independent review of executive compensation (i.e., someone other than the recipient of the compensation), and establishing a compensation committee to review and approve compensation arrangements or, at the least, requiring the Board to review and approve executive compensation arrangements. (*Id*. at pp. 64-65)

    o   **Reimbursement of Expenses**: Goldberg Kohn recommended that the Company adopt a formal reimbursement policy, including a requirement that business expenses be documented with expense reports and copies of receipts. The Company was encouraged to consider whether paying for cars, rent, utilities, and insurance for certain employees was appropriately reimbursable as business expenses. (*Id*. at p. 65)

- o **Tax Returns**: Goldberg Kohn recommended that the Company file all federal and state tax returns for any periods for which returns were required but not filed. The firm recommended that accountants and counsel be consulted regarding any penalties that might be owed for failure to file returns, and stated that, going forward, all Company tax returns should be filed on a timely basis. (*Id*. at pp. 65-66)

- o **Corporate Governance**: The GK Report recommends "that the Company appoint competent people with the appropriate background and training to oversee the essential functions of the Company, including finance and accounting, bank signing authority, fund raising and investor relations, legal documentation, compliance and administration." (*Id*. at 66.) Importantly, the firm also recommended that family members and friends who were providing services to the Company while receiving compensation from the Company be held to the same professional standards and accountability as independent employees. (*Id*.) Further, Goldberg Kohn stated that "Responsibility for all of the essential functions should not be vested in one person." (*Id*.) The firm noted that Zvi Feiner is a director with no role in management and an equity holder; the firm recommended that the Company also consider appointing an independent director with no economic ties to the Company. (*Id*.) Finally, the GK Report recommends that the Company hire a qualified Chief Financial Officer. (*Id*.)

- o **Proper Authorization and Contemporaneous Documentation**: Goldberg Kohn recommended that non-ordinary course transactions, such as loans to or for the benefit of executives or family members that are not within business matters of the Company be considered and approved by the Board and contemporaneously memorialized in writing. (*Id*. at 67)

- **Stock Transactions**: Goldberg Kohn recommended that the Company engage counsel with experience in securities laws to advise on any future stock offerings and to address issues with prior stock offerings or any other securities issues referenced in the GK Report. (*Id*.); and

- **Further Investigation of the Asserted Expenditures**: Goldberg Kohn stated that the Company should consider further investigation into the expenditures raised in the Simons Letter (questionable items on Company bank statements, etc.) as well as Joseph Fox's characterizations of expenditures. This suggestion emphasizes the farcical nature of Joseph Fox's statement in the February 2, 2014 email to shareholders that the GK Report did not find any misappropriation or misuse of Company funds. To the contrary, the GK Report put the onus on the Company to dig further into the issue, which the Company, thoroughly dominated by Joseph Fox as it was, clearly would not and did not do.

77.     In reality, the Board adopted few, if any, of Goldberg Kohn's suggestions, which is further evidence of its complete failure to adhere to the fiduciary duties owed to Plaintiffs, the Company, and its shareholders.

78.     The February 2, 2014 email is further intentionally misleading because it attaches 2010, 2011, 2012, and 2013 Company cash flow statements, which, the Board authors state, contain details from a Consolidated Income Statement for the Company, which is not attached. A subsequent audit of the Company for the years 2012-2014 conducted by the accounting firm of Frost Ruttenberg Rothplatt ("Frost Audit"), released in August 2015, reveals enormous negative income from the Income Statement and enormous negative shareholder equity from the balance sheet.

79.     The Frost Audit reveals, for example, that the Company lost nearly $4.5 million in 2013. A copy of the Frost Audit is attached hereto as **Exhibit D**.

80.     The omitted Consolidated Income Statement likely would have caused concern for shareholders and given them significant pause before investing further in the Company. Leaving out this key financial information about the Company deprived shareholders of vital information central to their decisionmaking.

81.     Such misleading communications from Board members constitute breach of fiduciary duty. By approving this shareholder communication or doing nothing to stop it, Cohn, as an officer and General Counsel, breached his duties to the shareholders as well.

82.     Further, the Board clearly did not want shareholders or prospective investors to see the GK Report, actively seeking to keep it designated confidential and intentionally mischaracterizing it in communications to shareholders.

**2014-15: The Beat Goes On**

83.     Very little, if anything, changed with respect to how the Company operated after the Goldberg Kohn Report. In the face of ongoing FINRA and SEC investigations, the Company continued to solicit current and prospective investors for new capital to keep itself afloat.

84.    On September 8, 2015, the SEC released orders concerning both Joseph Fox (the "Fox Order") and the Company.  In the Fox Order, the SEC found that with respect to Joseph Fox's sales of 1.2 million of his personal Company shares:

> Neither Fox nor anyone acting on his behalf took any steps to determine whether any of the individuals who purchased Fox's shares of Ditto Holdings stock were sophisticated investors.  At least two of the purchasers had previously identified themselves to Ditto Holdings as Non-Accredited investors.  The investors did not have access to financial statements or other required information about Ditto Holdings in connection with Fox's sales of Ditto Holdings common stock.  No registration statement was filed in connection with any of Ditto Holdings' securities, and no exemption from registration was applicable to Fox's sales.

Fox Order, SEC Release 33-9908/34-75857 (Sept. 8, 2015), attached hereto as **Exhibit E**, at p. 4.

85.    Joseph Fox was ordered by the SEC to pay a disgorgement of $125,210 and a civil penalty of $75,000.  (*Id.*)

86.    Also on September 8, 2015, the SEC issued an order (SEC Release No. 9907, Adm. Proc. No. 3-16794) (the "Company Order") finding that the Company violated Sections 5(a) and 5(c) of the Securities Act of 1933 by offering and selling securities through the mails or interstate commerce without a registration statement filed or an exemption from registration and directing the Company to pay a civil penalty of $50,000.  (Company Order, attached hereto as **Exhibit F**, at pp. 3, 4)

87.    Joseph Fox made intentionally misleading statements to shareholders (and to the public via press release) regarding the SEC's findings with respect to the Company.  On September 16, 2015, he sent an email to shareholders entitled "Vindication and Road-map for Shareholders Liquidity."  In that email, which was authorized by the Board, he wrote: "I am very pleased to report that our settlement with the SEC is official.  SoVesTech and I have been vindicated against all of Paul Simons' assertions to the SEC, our shareholders and the financial

community. . . . After a very thorough investigation of Simons' disingenuous claims of fraud and dishonesty against me and the Company, the SEC chose not to pursue <u>any</u> of Simons' claims." (Joseph Fox September 16, 2015 email to Shareholders, attached hereto as **Exhibit G**) (emphasis in original); *see also* iReach Press Release, September 11, 2015, attached hereto as **Exhibit H**).

88.     This statement is misleading for a number of reasons. First, the SEC is only charged with enforcing the securities laws. It made no determination one way or another concerning the validity of Simons' claims (raised in a demand letter separate from any SEC proceeding) of misappropriation of funds.

89.     Second, Joseph Fox characterizes the SEC's findings as penalties for "inadvertent technical rules violations." (Ex. G) The misleading nature of this characterization was the subject of admonishment from the SEC itself in its July 2016 Motion for Summary Disposition against Joseph Fox:

> Contrary to Fox's press release and e-mail message to investors, this matter does not involve only "technical rules violations," but rather it involves blatant and repeated violations of the key provisions of the federal securities laws that govern investor access to information upon which to make their investment decisions.
>
> . . .
>
> *Fox's violations of the securities registration requirements were egregious*. In leading Ditto Holdings' securities offerings, not only did Fox fail to ensure that non-accredited investors received the financial information that they were entitled to, but he also failed to ensure that Ditto Holdings had complete and accurate financial information to begin with. In connection with his personal sales, Fox did not take any steps to ensure that the investors who purchased his personal shares of Ditto Holdings were sophisticated or provide them with access to financial statements or other required information about Ditto Holdings.
>
> . . .
>
> He also illegally sold roughly $1.25 million of unregistered securities for his own benefit. Fox has spent a significant portion of his career in the securities industry and as the Chief Executive Offer of Ditto Holdings, Fox's

employment will provide ample opportunities for future violations as Ditto Holdings owns a broker-dealer firm.

Additionally, according to [documents attached to SEC's motion], Fox and Ditto Holdings are actively seeking to raise additional capital from investors right now. *Fox further demonstrated in the September 2015 press release and e-mail message to investors that he does not recognize the wrongful nature of his conduct and that he does not appreciate the importance of complying with the federal securities laws.*

SEC November 6, 2015 Division of Enforcement's Memorandum of Law in Support of Its Motion for Summary Disposition, attached hereto as **Exhibit I**, at pp. 9-11 (emphasis added).

90.     Any suggestion by Joseph Fox that the SEC was finished with him is also false. The Fox Order makes it clear that the SEC will conduct additional proceedings to determine the extent of non-financial, remedial sanctions against him.  (Fox Order, Ex. E, at 6)

91.     The fact that, as the SEC notes in its Motion for Summary Disposition, Joseph Fox was continuing to seek additional capital shows that, despite the GK Report and the SEC penalties levied against him and the Company, things were very much business as usual.  This lack of any meaningful change in the Company's *modus operandi* led Plaintiff Lawrence Wert to demand action.

**The Wert Demand Letter**

92.     Disgusted with the pattern of misappropriation of shareholder funds and overall corporate waste that continued to characterize Joseph Fox's reign as CEO of the Company, Wert, who has invested hundreds of thousands of his own dollars in the Company, retained counsel in the fall of 2015 to draft a demand letter to the Board and General Counsel Cohn demanding significant changes to the way the Company is structured and does business.

93.     The resulting 77-page letter (the "Wert Demand Letter") details the egregious violations by Joseph Fox and the other directors and officers of their duties of care, loyalty, and

good faith owed to the Company and its shareholders. A copy of the Wert Demand Letter is attached hereto as **Exhibit J**.

94. Stating that "The Directors must recognize their unfulfilled (and seemingly unacknowledged) duty to the shareholders. Their failure to take action to protect the shareholders and Company from the conduct of Joe Fox is the subject of much of this letter," the letter describes in great detail the transgressions discussed above, and demands that:

- Joseph Fox, Yitz Fox, and Avi Fox be removed from any financial authority and any ability to approve stock redemptions or loan forgiveness (Ex. J at p. 4);

- Joseph Fox, Yitz Fox and Avi Fox be excluded from any decision-making authority with respect to strategic initiatives (*Id.*); and

- A special election be held to nominate and elect independent directors. (*Id*. at p. 5)

95. Of the Fox family's sales of their own shares to the Company, the Wert Demand Letter states "The redemptions give the impression that the Fox family members were cashing out because they knew the Company was in trouble. The redemptions also give the impression that Joe Fox and the Company knew, in 2013, that the prices at which the Company was marketing its shares to new investors were unreasonable and did not reflect the actual value of the Company's stock. " (Ex. J at p. 18)

96. The Wert Demand Letter questions the veracity of Joseph Fox's claim that his Employment Agreement was committed to writing before the Simons Letter and the GK Report called its terms into question:

> The computer upon which the documents allegedly were drafted was destroyed. In addition, the spectacular sloppiness and lack of documentation regarding the expenditures and disbursements to and on behalf of Joe Fox during the years 2009 through 2013 do not suggest that Mr. Fox was concerned in the least with scrupulously documenting his personal withdrawals. Had he been tied to a specific annual cap in 2009 through 2013, it seems likely that he would have kept better records so that his withdrawals could be cross-checked against a specific

spending limit set forth in an employment agreement. . . . Even if we accept as true the assertion that the employment agreements were drafted and executed in 2009, the terms of the employment agreements would be completely unacceptable in any company that properly valued the interests of its shareholders.

Ex. J at p. 21

97.     The Wert Demand Letter concludes that "The problems with Mr. Fox's compensation arrangement are not limited to problems with recordkeeping. The absence of recordkeeping is simply a symptom of a larger problem within the Company---the lack of appropriate independent oversight with respect to the activities of Joe Fox and the other Insiders. . . . . And when someone raised these questions [about the propriety of business expenditures being made for items such as Las Vegas trips] (Paul Simons), he was fired, sued for defamation, and vilified repeatedly in Company communications with the shareholders." (Ex. J at p. 23)

98.     Of Joseph Fox's after-the-fact reclassification of $58,000 in payments to his wife as advances that should be included in his annual $250,000 allotment, the Wert Demand Letter states "First, even if one accepts Joe Fox's position that, with respect to monies drawn against his $250,000 annual allotment, he could direct those monies to be paid to anyone of his choosing, the payments to his wife make no sense except in the context of an attempt to disguise the payments---from the taxing authorities or the Company's shareholders or both." (*Id*. at p. 32)

99.     Regarding the Company payments to "Savaged the Movie," which Joseph Fox claims should be treated as funds borrowed under his dubious Promissory Note, the Wert Demand Letter states "[W]hen the Company disburses funds directly to a speculative, completely unrelated venture like a movie being produced by the CEO's son, the shareholders are entitled to scrupulous documentation not after-the-fact explanations and convoluted stories about Company loans to the CEO---particularly when the shareholders have no reason to believe

that the loan has been or will be repaid." (*Id*. at p. 39)

100. Of the Company's $15,000 loan to General Counsel Cohn's son, who was facing an impending SEC action for defrauding investors, the Wert Demand Letter concludes: "It is inconceivable that an independent board would have approved a loan by the Company to the son of one of the Insiders who was confronted with an SEC investigation into whether he had defrauded his clients. [This loan] is a compelling example of the extent to which the Insiders have been operating the Company for their own benefit . . . in a manner that shocks the conscience." (*Id*. at p. 44)

101. The Wert Demand Letter features a lengthy analysis of the sale of Company shares by Joseph Fox and his family members, stating that:

> The use of Company funds---particularly funds collected primarily from new investors---to redeem the shares of Insiders' family members is quite another [thing]. In a properly operated company such a redemption plan would have been subject to disinterested Board scrutiny to make sure the shareholders' interests were being protected. . . . Investors who purchased shares in 2013 are bound to be furious when they learn the truth. The Company was actively marketing its shares during 2013 at prices from $1.25/share to $1.50/share. During that same time frame, Joe Fox was selling his shares for anywhere between $.90/share to $1.10/share, and his family members (including Avi Fox, Yitz Fox, company Insiders) were willing to sell their shares back to the Company for $.30/share to $.50/share. Investors [who] purchased shares in 2013 who learn the truth are likely to [conclude that] . . . the Company was raising money from new investors, in part, so that Joe Fox's family members could unload shares that Joe Fox knew to be worthless or at least grossly overvalued.

(*Id*. at pp. 59-61)

102. The Wert Demand Letter also strongly questions the judgment of the Board in initiating, pursuing, and using Company funds to pay for a defamation lawsuit against Paul Simons following the delivery of the Simons Letter: "[W]e reiterate Mr. Wert's position that the pursuit of defamation claims against Mr. Simons has been an outrageous waste of Company monies, and has created the strong impression that Mr. Fox and the other Insiders are using

Company monies to wage an offensive campaign to prevent their wrongdoing and self-dealing from being exposed." (*Id.* at p. 63) Of the Company's use of shareholder communications to try to discredit Simons, the Wert Demand Letter says "The Company's Board seems to be unaware that communications to shareholders are not supposed to be "advocacy" pieces where the Company spins a set of facts selectively and aggressively to suit the aims of the Company's CEO. . . . [S]hareholders and investors must depend upon one source---the Company---to give them a fair picture of the truth." (*Id.* at p. 66)

103.    The Wert Demand Letter closes with an appeal to the directors and officers of the Company other than Joseph Fox, warning them that, by allowing Joseph Fox to run the Company in an unsupervised, unchecked fashion, they have put themselves in danger of liability in a derivative action brought on behalf of the Company by the shareholders. (*Id.* at p. 76) Family members of insiders are also warned of potential liability for their participation in improper transactions. (*Id.*)

104.    The Company did nothing to change its way of doing business in response to the Wert Demand Letter. Within a month of the letter, Joseph Fox notified all shareholders that he was shutting down Ditto Trade because it was out of money and could not pay its bills.[11]

105.    On April 7, 2016, Paul Simons was awarded approximately $2.7 million in his lawsuit against Ditto Trade, Ditto Holdings, and Joseph Fox. (*See* April 7, 2016 Final Judgment, attached hereto as **Exhibit M**). The judgment breaks down as follows: $810,000 against Ditto Holdings; $1,211,339.83 against Ditto Holdings and Ditto Trade, jointly and severally; and $653,105.18 against Ditto Holdings and Ditto Trade, jointly and severally, for attorneys' fees and costs. (*Id.*) On information and belief, this judgment remains unpaid.

---

[11] Ditto Trade was expelled by FINRA on March 3, 2016 for failure to pay fines and costs. (*See* FINRA BrokerCheck Report on Ditto Trade, Inc., attached hereto as **Exhibit K**) Joseph Fox was permanently barred by FINRA on May 18, 2016. (*See* FINRA Broker Report on Yosef Yehuda Fox, attached hereto as **Exhibit L**)

**Neglect of Crucial Assets**

106.    Although Ditto Holdings (as SoVesTech) has basically ceased operations as well, the directors and officers have continued to breach their fiduciary duties to the Company.  The only remaining Company asset of any value is the intellectual property associated with the TradeShare application, which is the technological platform underpinning the Company's ability to offer customers the opportunity to share in lead traders' trades in real time.  There are three patent applications associated with this technology, Patent Application 14/703,810 (the '810 Patent Application); Patent Application 13/917,440 (the '440 Patent Application); and 13/917,474 (the '474 Patent Application).

107.    The officers and directors of the Company have been ignoring these patent applications, to such an extent that the most valuable of them, the '440 Patent Application, was classified by the U.S. Patent and Trademark Office ("USPTO") as "abandoned" on September 9, 2016.  (*See* USPTO Roster, attached hereto as **Exhibit N**)

108.    Recognizing the urgent need to preserve these valuable Company assets, Plaintiffs have taken it upon themselves to pay the Company's outside patent counsel to prepare and file the necessary paperwork to attempt to revive the '440 Patent Application and to continue prosecution of the other two patent applications, one of which was within weeks of abandonment when Plaintiffs began to inquire with patent counsel about the status of the applications.

109.    At this point, the officers and directors have completely abdicated their responsibility to Plaintiffs, the Company, and the shareholders.  Allowing the only remaining valuable asset of the Company to lapse at the USPTO is a final blow to the well-being of the Company and the shareholders to whom the directors are bound by duties of loyalty and care, and is symbolic of the way the directors have treated their responsibilities throughout the

Company's history. Their gross negligence, mismanagement, and pillaging of shareholder investment funds has brought the Company to where it is today, a shell which requires the last-minute efforts of conscientious shareholders to preserve its imperiled remaining assets.

**COUNT I**

**SECURITIES FRAUD (UNDER SECURITIES AND EXCHANGE COMMISSION RULE 10b 5)**

**(ALL DEFENDANTS)**

110.     Plaintiffs repeat and re-allege Paragraphs 1 through 109 as though fully set forth as Paragraph 110.

111.     Plaintiffs bring Count I on behalf of themselves individually.

112.     In connection with offering shares of the Company for sale to Plaintiffs and other prospective and existing Company investors (collectively, "Company Investors"), Defendants knowingly, through a pattern of material misrepresentations and omissions, deceived the Company Investors.

113.     This intentional deception induced Plaintiffs as well as the Company Investors to purchase shares of the Company and hold on to those shares.

114.     Such material deceptive misrepresentations and omissions include, but are not limited to:

- Defendants' failure to provide the Company Investors with complete, up-to-date information about the Company's financial condition;

- Defendants' failure to file timely, proper registration documents with the SEC regarding any of their offerings of Company stock;

- Defendants' failure to stop, and failure to disclose to the Company Investors, Joseph Fox's unchecked use of Company funds for his and his family's personal purposes, unrelated to any legitimate business purpose, as detailed above;

- Defendants' active concealment from the Company Investors of the material fact that the Company had no general ledger or any other means of accurately

accounting for Joseph Fox's unchecked use of Company funds for his and his family's personal purposes, unrelated to any legitimate business purpose, as detailed above, and no means of accounting for the purpose behind cash withdrawals from Company accounts;

- Defendants' active concealment from the Company Investors of the material fact that the Company had no legitimate compensation structure for executives and employees and, instead, paid them on an ad hoc basis and, in the case of Joseph Fox, Avi Fox, and Rosenberg, in the form of "advances" which could, at the whim of the recipient, be treated as income or a loan from the Company (but, in reality, were never properly classified at all);

- Defendants' active concealment from the Company Investors of the Goldberg Kohn Report (including their efforts to have it classified as a confidential court document due to non-existent "trade secrets" purportedly contained therein);

- Defendants' issuance of misleading shareholder communications, including but not limited to the February 2, 2014 email from the Board members to all shareholders which mischaracterized the Goldberg Kohn Report (by, among other things, failing to disclose its conclusions about the Company's utter lack of appropriate accounting, failure to file tax returns, and Joseph Fox's unchecked power over distribution and use of Company funds) and included incomplete financial information designed to conceal the true financial condition of the Company from Plaintiffs and the other shareholders;

- The September 16, 2015 "Shareholder Vindication" email to all shareholders, written by Joseph Fox and approved by the Board and Secretary/General Counsel Cohn, which mischaracterized the import and severity of the SEC's findings against Joseph Fox and the Company (by, among other things, characterizing the punished transgressions as "inadvertent" and "technical violations" and continuing the Company's pattern of issuing communications to all shareholders which failed to disclose the true financial condition of the Company and Defendants' pillaging of Company assets);

- Defendants' authorization and participation in Joseph Fox's personal guarantees of the Company Investors' purchases of Company stock and/or loans to the Company while failing to disclose to the Company Investors his lack of financial ability to meet these guarantees (and that his only acknowledged asset at the time was his house in Long Grove, Illinois, which was foreclosed upon), which the Defendants were or should have been aware of;

- Defendants' concealment from the Company Investors of the material fact that the Board approved a $100,000 advance, in the form of a promissory note, to Joseph Fox supposedly in return for his willingness to personally guarantee some investors' purchases of Company stock and/or loans to the Company;

- Defendants' active concealment from the Company Investors of Company CEO Joseph Fox's compulsive gambling and use of Company funds to further his poker pursuits, and those of his son Jorden Fox, including but not limited to using Company funds to finance trips to Las Vegas for himself and Jorden Fox;

- Defendants' active concealment from the Company Investors of the material fact that the Company had not filed required federal or state tax returns;

- Defendants' active concealment from Plaintiffs and the other shareholders the fact that the Company made a $15,000 loan to the son of Secretary/General Counsel Cohn, who was himself under SEC investigation for defrauding investors, for no apparent business purpose;

- Defendants' failure to stop Joseph Fox from adopting and carrying out a policy of never showing actual Company financial information to the Company Investors and only sharing projections with prospective investors who requested financial information about the Company; and

- Defendants' authorization and participation in the sale of personally-owned shares of Company stock by various Fox family members at prices lower than the Company was offering to outside investors.

115.   Defendants, who had ultimate authority over the materially misleading and deceptive communications explained herein, knew that it was necessary for them to conceal the Goldberg Kohn Report and true financial information from the Company Investors, because if the Company Investors knew the truth about Defendants' mismanagement of the Company and its precarious financial condition, there was a substantial likelihood that they would not continue to hold their current Company shares or purchase new Company shares.

116.   Defendants also knew that their deceptive acts and omissions significantly altered the information available to the Company Investors in such a manner as to make it impossible for the Company Investors to make informed decisions regarding Company stock.

117.   The Company Investors purchased and/or held on to shares of Company stock in reasonable reliance upon these material misleading acts and/or omissions of Defendants.

118.   The Company Investors suffered damages in the form of their funds invested in Company stock which is now worthless due to Defendants' deceptive acts and mismanagement

of the Company as described herein.

119.    The Company Investors' damages were caused by Defendants' deceptive acts and/or omissions as described herein.

WHEREFORE, Plaintiffs pray for relief in their favor and against the Defendants Stuart Cohn, David Jonathan Rosenberg, Zvi Feiner, Scott Appleby, and Avi Fox as follows:

(i)     Awarding compensatory damages for losses suffered as a result of Defendants' misleading statements and omissions described herein;

(ii)    Awarding Plaintiffs their costs of suit, including attorneys' fees relating to this action; and

(iii)   Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## COUNT II

## CORPORATE WASTE UNDER DELAWARE LAW

## (ALL DEFENDANTS)

120.    Plaintiffs repeat and re-allege Paragraphs 1 through 119 as though fully set forth as Paragraph 120.

121.    Plaintiffs bring Count II on a derivative basis, on behalf of the Company and its shareholders.

122.    In conducting the business of the Company as described above, Defendants squandered Company assets by engaging in extremely one-sided transactions that benefited only Defendants themselves at the expense of the Company and its shareholders.  These transactions were not undertaken in good faith, nor was there any substantial consideration received by the Company in the transactions.

123.    Such transactions include, but are not limited to:

- Sales of personal stock in the Company and/or sales of personal stock back to the Company at prices below the prices being offered to outside investors;

- Investing Company funds in a defamation lawsuit against Paul Simons, a lawsuit which has yielded no consideration to the Company in exchange for the Company funds used to pursue the lawsuit;

- Use of Company funds for the sole benefit of Joseph Fox and his family members with no legitimate business justification;

- Loaning Company funds to the son of Secretary and General Counsel Stuart Cohn at a time when the recipient of the loan was under SEC scrutiny for fraud;

- Spending Company money on Las Vegas junkets unrelated to any legitimate business purpose, including extensive engagement in poker games and poker tournaments; and

- Transmitting Company funds to the movie production company of Joseph Fox's son, Jorden Fox, with no legitimate business justification.

WHEREFORE, Plaintiffs pray for relief in favor of the Company and its shareholders, and against the Defendants Stuart Cohn, David Jonathan Rosenberg, Zvi Feiner, Scott Appleby, and Avi Fox as follows:

(i)    Awarding compensatory and punitive damages in an amount deemed fair and equitable by the Court resulting from the Defendants' squandering of Company assets through one-sided transactions;

(ii)    Awarding Plaintiffs their costs of suit, including attorneys' fees relating to this action; and

(iii)    Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## COUNT III

### BREACH OF FIDUCIARY DUTIES UNDER DELAWARE LAW

### (ALL DEFENDANTS)

124.    Plaintiffs repeat and re-allege Paragraphs 1 through 123 as though fully set forth as Paragraph 124.

125.    Plaintiffs bring Count III on behalf of themselves individually and, on a derivative basis, on behalf of the Company and its shareholders.

126.    Under the laws of Delaware, under which the Company was incorporated, Defendants owe fiduciary duties of loyalty, care, and good faith to Plaintiffs and the Company

by virtue of their roles as directors and officers of the Company.

127.    Defendants breached their fiduciary duties to Plaintiffs and the Company in many ways, including, but not limited, to the following:

- Abusing their positions of trust and confidence to further their private interests at the expense of the Company and its shareholders;

- Failing to have any semblance of a compliance program in place to ensure adherence to applicable laws and regulations;

- Enabling a culture of complete unaccountability and mismanagement, in which Joseph Fox wielded unchecked authority to spend Company funds as he sees fit, to the benefit of himself and his family members and to the detriment of the Company and its other shareholders, all with the approval of his fellow Board members and Secretary/General Counsel Cohn;

- Allowing Joseph Fox to sell his personal Company shares at lower prices than Company stock was otherwise being offered, without proper registration or regard for whether or not the purchasers of his shares were accredited, sophisticated investors in violation of SEC regulations;

- Allowing Joseph Fox's relatives to dump shares back to the Company at bargain-basement prices much lower than Company shares were being marketed and purchased by investors at the same time;

- Offering shares of the Company for sale to investors without furnishing adequate information about the financial condition and historical performance of the Company;

- Sending Company funds to the movie production company of Joseph Fox's son, Jorden Fox, thus placing shareholder monies in a highly speculative venture without any legitimate business purpose;

- Failing to keep a proper general ledger of payments from Company accounts, thus enabling Joseph Fox and his family members to pillage Company funds with no oversight;

- Failing to file tax returns on behalf of the Company for several years;

- Keeping important information about the Company, including the Goldberg Kohn Report, away from investors and potential investors;

- Failing to meaningfully implement the suggestions in the Goldberg Kohn Report;

- Using Company funds to pay for Joseph Fox's personal vendetta, a defamation lawsuit against fired whistleblower Paul Simons;

- Issuing intentionally misleading shareholder communications, such as an email stating that Joseph Fox had been "vindicated" by the SEC, when this was not true at all;

- Ignoring two significant demand letters from shareholders;

- Endangering the Company's only remaining valuable asset, the intellectual property associated with the TradeShare application, by ignoring required steps to keep the associated patent applications alive; and

- Actively concealing their breaches of fiduciary duty to prevent their discovery by Plaintiffs and shareholders until Plaintiffs undertook to uncover the truth in preparation of this lawsuit.

128.    By virtue of Defendants' past and continuing breach of fiduciary duties, Plaintiffs

and the Company's shareholders have been and continue to be damaged.

WHEREFORE, Plaintiffs pray for relief in their favor, and in favor of the Company and its shareholders, and against the Defendants Stuart Cohn, David Jonathan Rosenberg, Zvi Feiner, Scott Appleby, and Avi Fox as follows:

(i)    Ordering a dissolution and accounting of the Company, including a good faith determination of the Company's Fair Market Value;

(ii)    Awarding compensatory and punitive damages in an amount deemed fair and equitable by the Court resulting from the Defendants' deliberate, willful, and ongoing conduct;

(iii)    Awarding Plaintiffs their costs of suit, including attorneys' fees relating to this action; and

(iv)    Awarding Plaintiffs such other and further relief as the Court deems just and proper.

**COUNT IV**

**FRAUDULENT MISREPRESENTATION UNDER ILLINOIS LAW**

**(ALL DEFENDANTS)**

129.    Plaintiffs repeat and re-allege Paragraphs 1 through 128 as though fully set forth

herein as Paragraph 129.

130.    Plaintiffs bring Count IV on behalf of themselves individually.

37

131.    In connection with offering shares of the Company for sale to Plaintiffs and other prospective and existing Company investors (collectively, the "Company Investors"), Defendants knowingly defrauded the Company Investors by inducing them to purchase and/or keep shares of the Company through a pattern of false statements of material fact upon which the Company Investors relied, suffering damages arising therefrom.

132.    These false statements of material fact upon which the Company Investors relied include, but are not limited to:

- Defendants' provision of incomplete, misleading information about the Company's financial condition in response to requests from the Company Investors as they considered whether to participate in the Company's various offerings of stock;

- Defendants' issuance of misleading shareholder communications, including but not limited to the February 2, 2014 email from the Board members to all shareholders which mischaracterized the Goldberg Kohn Report (by, among other things, failing to disclose its conclusions about the Company's utter lack of appropriate accounting, failure to file tax returns, and Joseph Fox's unchecked power over distribution and use of Company funds and, instead, stating that the GK Report found no corporate impropriety or misuse of Company funds) and included incomplete financial information designed to conceal the true financial condition of the Company from Plaintiffs and the other shareholders; and

- The September 16, 2015 "Shareholder Vindication" email to all shareholders, written by Joseph Fox and approved by the Board and Secretary/General Counsel Cohn, which mischaracterized the import and severity of the SEC's findings against Joseph Fox and the Company (by, among other things, characterizing the punished transgressions as "inadvertent" and "technical violations", creating the impression that the SEC was done with Joseph Fox, and continuing the Company's pattern of issuing communications to all shareholders which failed to disclose the true financial condition of the Company and Defendants' pillaging of Company assets).

133.    These statements were known by Defendants to be false at the time they made them to the Company Investors, and Defendants made them for the purpose of inducing the Company Investors to purchase and/or keep shares of Company stock, which the Company Investors did.  The Company Investors suffered damages as a result of these false statements of

material fact in that they invested their funds in stock that proved to be worthless.

WHEREFORE, Plaintiffs pray for relief for themselves and against the Defendants Stuart Cohn, David Jonathan Rosenberg, Zvi Feiner, Scott Appleby, and Avi Fox, as follows:

(i)    Awarding compensatory and punitive damages for losses suffered as a result of Defendants' intentional false statements of material fact described herein; and

(ii)    Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## COUNT V

## FRAUDULENT CONCEALMENT UNDER ILLINOIS LAW

## (ALL DEFENDANTS)

134.    Plaintiffs repeat and re-allege Paragraphs 1 through 133 as though fully set forth as Paragraph 134.

135.    Plaintiffs bring Count V on behalf of themselves individually.

136.    In connection with offering shares of the Company for sale to Plaintiffs and other prospective and existing Company investors (collectively, "Company Investors"), Defendants knowingly, through a pattern of concealment of material facts, deceived the Company Investors.

137.    Defendants owed the Company Investors a fiduciary duty due to the trust and confidence the Company Investors placed in Defendants, who had superior knowledge about the manner in which the Company was being run and about the Company's financial condition.

138.    Defendants were under a duty to share material facts about the Company's operation and financial condition that the Company Investors could not have discovered through reasonable inquiry or inspection (or were prevented by Defendants from so discovering). Defendants intended to induce false belief in the Company Investors by concealing these material facts.  The Company Investors reasonably relied upon Defendants' concealment of material facts because Defendants owed the Company a duty to communicate accurate

information about the Company stock being offered for sale. Without accurate information regarding the investment opportunities, the Company Investors could not make properly informed decisions about whether or not to purchase and/or retain their stock in the Company. The Company Investors, who would have made different decisions had Defendants not concealed material facts from them, were damaged by their reliance upon Defendants by investing in and/or holding onto Company stock that proved to be worthless.

139.    These material facts which Defendants concealed from the Company Investors include, but are not limited to:

- Defendants' intentional failure to disclose to the Company Investors Joseph Fox's unchecked use of Company funds for his and his family's personal purposes, unrelated to any legitimate business purpose, as detailed above;

- Defendants' active concealment from the Company Investors of the material fact that the Company had no general ledger or any other means of accurately accounting for Joseph Fox's unchecked use of Company funds for his and his family's personal purposes, unrelated to any legitimate business purpose, as detailed above, and no means of accounting for the purpose behind cash withdrawals from Company accounts;

- Defendants' active concealment from the Company Investors of the material fact that the Company had no legitimate compensation structure for executives and employees and, instead, paid them on an ad hoc basis and, in the case of Joseph Fox, Avi Fox, and Rosenberg, in the form of "advances" which could, at the whim of the recipient, be treated as income or a loan from the Company (but, in reality, were never properly classified at all);

- Defendants' active concealment from the Company Investors of the Goldberg Kohn Report (including their efforts to have it classified as a confidential court document due to non-existent "trade secrets" purportedly contained therein);

- Defendants' authorization and participation in Joseph Fox's personal guarantees of the Company Investors' purchases of Company stock and/or loans to the Company while failing to disclose to the Company Investors his lack of financial ability to meet these guarantees (and that his only acknowledged asset at the time was his house in Long Grove, Illinois, which was foreclosed upon), which the Defendants were or should have been aware of;

- Defendants' concealment from the Company Investors of the material fact that the Board approved a $100,000 advance, in the form of a promissory note, to Joseph

Fox supposedly in return for his willingness to personally guarantee investors' purchases of Company stock and/or loans to the Company;

• Defendants' active concealment from the Company Investors of Company CEO Joseph Fox's compulsive gambling and use of Company funds to further his poker pursuits, and those of his son Jorden Fox, including but not limited to using Company funds to finance trips to Las Vegas for himself and Jorden Fox;

• Defendants' active concealment from the Company Investors of the material fact that the Company had not filed required federal or state tax returns;

• Defendants' active concealment from Plaintiffs and the other shareholders the fact that the Company made a $15,000 loan to the son of Secretary/General Counsel Cohn, who was under SEC investigation himself for defrauding investors, for no apparent business purpose; and

• Defendants' failure to stop Joseph Fox from adopting and carrying out a policy of never showing actual Company financial information to the Company Investors and only sharing projections with prospective investors who requested financial information about the Company.

140. These concealed facts were known by Defendants to be material at the time they concealed them from the Company Investors, and Defendants concealed them for the purpose of inducing the Company Investors to purchase and/or keep shares of Company stock, which the Company Investors did. The Company Investors suffered damages as a result of Defendants' failure to disclose these material facts in that they invested their funds in stock that proved to be worthless.

WHEREFORE, Plaintiffs pray for relief for themselves and against the Defendants Stuart Cohn, David Jonathan Rosenberg, Zvi Feiner, Scott Appleby, and Avi Fox, as follows:

(i) Awarding compensatory and punitive damages for losses suffered as a result of Defendants' intentional false statements of material fact described herein; and

(ii) Awarding Plaintiffs such other and further relief as the Court deems just and proper.

41

## COUNT VI

## NEGLIGENT MISREPRESENTATION

## (ALL DEFENDANTS)

141.     Plaintiffs repeat and re-allege Paragraphs 1 through 140 as though fully set forth as Paragraph 141.

142.     Plaintiffs bring Count VI on behalf of themselves individually and, on a derivative basis, on behalf of the Company and its shareholders.

143.     In connection with offering shares of the Company for sale to Plaintiffs and other prospective and existing Company investors (collectively, the "Company Investors"), Defendants, through a pattern of carelessness or negligence in ascertaining the truth of statements of material fact, deceived the Company Investors by inducing them to purchase and/or keep shares of the Company through a pattern of false statements and omissions of material fact upon which the Company Investors relied, suffering damages arising therefrom.

144.     Defendants owed the Company Investors a duty to communicate accurate information about the Company stock being offered for sale.  Accordingly, the Company Investors reasonably relied upon Defendants' negligent and careless false statements of fact in the course of considering whether to purchase and/or hold on to Company stock.  Without accurate information regarding the investment opportunities, the Company Investors could not make properly informed decisions about whether or not to purchase and/or retain their stock in the Company.  Defendants breached this duty to communicate accurate information, and the Company Investors suffered damages as a result of their reasonable reliance upon Defendants' negligent and careless false statements of fact.

145.     These false statements and omissions of material fact upon which the Company Investors relied include, but are not limited to:

- Defendants' provision of incomplete, misleading information about the Company's financial condition in response to requests from the Company Investors as they considered whether to participate in the Company's various offerings of stock;

- Defendants' issuance of misleading shareholder communications, including but not limited to the February 2, 2014 email from the Board members to all shareholders which mischaracterized the Goldberg Kohn Report (by, among other things, failing to disclose its conclusions about the Company's utter lack of appropriate accounting, failure to file tax returns, and Joseph Fox's unchecked power over distribution and use of Company funds and, instead, stating that the GK Report found no corporate impropriety or misuse of Company funds) and included incomplete financial information designed to conceal the true financial condition of the Company from Plaintiffs and the other shareholders;

- The September 16, 2015 "Shareholder Vindication" email to all shareholders, written by Joseph Fox and approved by the Board and Secretary/General Counsel Cohn, which mischaracterized the import and severity of the SEC's findings against Joseph Fox and the Company (by, among other things, characterizing the punished transgressions as "inadvertent" and "technical violations" and continuing the Company's pattern of issuing communications to all shareholders which failed to disclose the true financial condition of the Company and Defendants' pillaging of Company assets).

- Defendants' failure to disclose to the Company Investors the material fact of Joseph Fox's unchecked use of Company funds for his and his family's personal purposes, unrelated to any legitimate business purpose, which but for their negligence and carelessness Defendants would have known about and disclosed;

- Defendants' failure to disclose to the Company Investors the material fact that the Company had not filed required federal or state tax returns, which but for their negligence and carelessness Defendants would have known about and disclosed;

- Defendants' failure to disclose to the Company Investors the material fact of Joseph Fox's personal guarantees of some of the Company Investors' purchases of Company stock and/or loans to the Company and his lack of financial ability to meet these guarantees (and that his only acknowledged asset at the time was his house in Long Grove, Illinois, which was foreclosed upon), which but for their negligence and carelessness Defendants would have known about and disclosed;

- Defendants' failure to disclose to the Company Investors the material fact of Company CEO Joseph Fox's compulsive gambling and use of Company funds to further his poker pursuits, and those of his son Jorden Fox, including but not limited to using Company funds to finance trips to Las Vegas for himself and Jorden Fox, which but for their negligence and carelessness Defendants would have known about and disclosed;

43

- Defendants' failure to disclose to the Company Investors of the material fact that the Company had no general ledger or any other means of accurately accounting for Joseph Fox's unchecked use of Company funds for his and his family's personal purposes, unrelated to any legitimate business purpose, as detailed above, and no means of accounting for the purpose behind cash withdrawals from Company accounts; which but for their negligence and carelessness Defendants would have known about and disclosed; and

- Defendants' failure to disclose to the Company Investors of the material fact that the Company had no legitimate compensation structure for executives and employees and, instead, paid them on an ad hoc basis and, in the case of Joseph Fox, Avi Fox, and Rosenberg, in the form of "advances" which could, at the whim of the recipient, be treated as income or a loan from the Company (but, in reality, were never properly classified at all), which but for their negligence and carelessness Defendants would have known about and disclosed.

146.    These statements and omissions were false, and Defendants made them in the course of inducing the Company Investors to purchase and/or keep shares of Company stock, which the Company Investors did. The Company Investors suffered damages as a result of their reasonable reliance upon these false statements and omissions of material fact in that they invested their funds in stock that proved to be worthless.

WHEREFORE, Plaintiffs pray for relief in their favor, and in favor of the Company and its shareholders, and against the Defendants, Stuart Cohn, David Jonathan Rosenberg, Zvi Feiner, Scott Appleby, and Avi Fox as follows:

(i)    Awarding compensatory and punitive damages for losses suffered as a result of Defendants' negligent and careless false statements and omissions of material fact described herein; and

(ii)    Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## COUNT VII

## LEGAL MALPRACTICE UNDER ILLINOIS LAW

### (STUART COHN)

147.    Plaintiffs repeat and re-allege Paragraphs 1 through 146 as though fully set forth as Paragraph 147.

148.    Plaintiffs bring Count VII on behalf of themselves individually, and, on a

44

derivative basis, on behalf of the Company and its shareholders, and against Defendant Stuart Cohn.

149.    Defendant General Counsel Stuart Cohn, appointed by the Company's Board to serve as its chief legal officer, was the Company's lawyer.  As such, he had a duty to Plaintiffs, the Company, and its shareholders to act in his client's (i.e., the Company's) best interest in the execution of his duties.

150.    Cohn utterly failed to fulfill this duty:

- He failed to ensure that the Company complied with basic legal obligations (i.e., filing annual tax returns);

- He failed to ensure that the Company's offerings of securities were timely registered with the SEC;

- He failed to ensure that the information provided to the Company Investors regarding the Company's offerings of securities was truthful, accurate, and complete;

- As the Company's lawyer, he knew or should have known of the corporate improprieties (including material violations of securities laws and breaches of fiduciary duty) occurring within the Company as described above, but did nothing to report these improprieties to the Board or to external authorities such as the SEC;

- He approved a loan of Company funds, with no purpose related to the Company's business, to his son Clayton Cohn, whom he knew or should have known was facing an SEC investigation into his allegedly fraudulent operation of a hedge fund;

- He approved Joseph Fox's sales of his personal Company stock to unaccredited investors without proper registration or the provision to prospective purchasers of adequate information concerning the investments and at prices well below what the Company was offering to outside investors;

- He knew or should have known (i) that Joseph Fox was personally guaranteeing

45

some of the Company Investors' purchases of Company stock and/or loans to the Company despite his lack of financial ability to meet these guarantees (and that his only acknowledged asset at the time was his house in Long Grove, Illinois, which was foreclosed upon), and (ii) that this material fact was not being shared with all Company Investors as they considered whether or not to invest in the Company and/or hold on to their investments in the Company;

- Knew or should have known that (i) the Board approved a $100,000 advance, in the form of a promissory note, to Joseph Fox supposedly in return for his willingness to personally guarantee investors' purchases of Company stock and/or loans to the Company, and (ii) that his material fact was not being shared with all Company Investors as they considered whether or not to invest in the Company and/or hold on to their investments in the Company;

- Knew or should have known that Joseph Fox improperly gave this $100,000 advance to a movie production company operated by his son, Jorden Fox;

- Knew or should have known that Joseph Fox and Avi Fox had Employment Agreements which purported to enable them to "advance" Company funds to themselves while deferring treatment of these advances as income or loans to some indefinite point in the future;

- Knew or should have known that (i) there was no legitimate means of accounting for these purportedly authorized "advances," which Joseph Fox later claimed he kept track of in his head, and (ii) that the material fact of this complete lack of a legitimate executive compensation system was not being disclosed to the Company Investors;

- Knew or should have known that there was no consistently legitimate system for compensating any Company employees and that this material fact was not being disclosed to the Company Investors;

- He approved the use of Company funds to pursue a retaliatory lawsuit against whistleblower Paul Simons;

- He approved and participated in several misleading communications to shareholders regarding the condition of the Company and the status of the regulatory proceedings against Joseph Fox and the Company, including the February 2, 2014 email and the September 16, 2015 "Shareholder Vindication" email described above;

- He failed to ensure that the Company implemented the suggestions contained in the Simons Letter, the Goldberg Kohn Report, and/or the Wert Demand Letter;

- He willfully or negligently allowed the patent applications associated with the TradeShare application to be abandoned in one case and nearly abandoned in another, thus endangering the Company's only remaining valuable asset;

- He assisted the other officers and directors in concealing material information, such as the true financial condition of the Company, the contents of the Goldberg Kohn Report, and the status of regulatory proceedings from shareholders;

- He failed to ensure the implementation of a proper auditing system for the Company's finances;

- He failed to control or monitor the Fox family's pillaging of Company funds for their own personal use without any proper business purpose, as described above, of which he knew or should have known; and

- He failed to implement any internal monitoring system to detect noncompliance with applicable laws and regulations or to utilize any such system.

151.    These acts fall below the standard of care expected of attorneys in this jurisdiction, and Plaintiffs suffered damages as a result, in the form of losses on investments made and retained due to Cohn's actions described above as well as the attorneys' fees that Plaintiffs have expended to try to keep the Company's patent applications alive.

WHEREFORE, Plaintiffs pray for relief in favor of themselves, and, on a derivative basis, on behalf of the Company and its shareholders, and against Defendant Stuart Cohn as follows:

(i)    Awarding compensatory damages in an amount deemed fair and equitable by the Court resulting from Stuart Cohn's malpractice, including attorneys' fees paid by Plaintiffs to the Company's outside patent counsel; and

(ii)    Awarding Plaintiffs such other and further relief as the Court deems just and proper.

*Counsel for Plaintiffs*

By: /s/Dean A. Dickie_____
Dean A. Dickie
Eric J. Gribbin
Ryan C. Williams
Akerman LLP
71 South Wacker Drive, 46th Floor

Chicago, IL  60606
312-634-5700 – Telephone
312-424-1910 – Facsimile