**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAWRENCE J. WERT,** | ) | |
| **RICHARD D. KINCAID, and** | ) | |
| **JAMES O. MYERS, individually and** | ) | |
| derivatively on behalf of Ditto Holdings, Inc. | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 17 C 219** |
| | ) | |
| **STUART COHN, ZVI FEINER,** | ) | |
| **DAVID JONATHAN ROSENBERG,** | ) | |
| **and AVI FOX,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Lawrence Wert, Richard Kincaid, and James Myers, all shareholders of Ditto

Holdings, have sued members of Ditto Holdings' board of directors and its general

counsel in connection with alleged mismanagement, fraud, and concealment of the

company's finances and operations. Plaintiffs allege that they invested additional funds

and retained their initial investments in Ditto based on defendants' misrepresentations

and omissions regarding the company's financial condition. Plaintiffs also allege that

defendants knew or should have known that directors Joseph and Avi Fox were

engaged in practices that constituted financial mismanagement of Ditto, breach of

fiduciary duty, and corporate waste.

Specifically, Myers has sued Cohn under sections 10(b) and 20(a) of the

Securities Exchange Act and Securities and Exchange Commission (SEC) Rule 10b–5

for fraud in connection with Myers's purchase of shares of Ditto stock (Count 1 of the amended complaint). Plaintiffs have brought additional state law claims against defendants for corporate waste (Count 2), breach of fiduciary duty (Count 3), fraudulent misrepresentation (Count 4), fraudulent concealment (Count 5), and negligent misrepresentation (Count 6). Lastly, plaintiffs have sued Cohn for legal malpractice (Count 7). Plaintiffs bring the corporate waste claim solely on a derivative basis, the breach of fiduciary duty, negligent misrepresentation, and legal malpractice claims both individually and on a derivative basis, and the fraudulent misrepresentation and concealment claims solely on an individual basis.

Defendants Stuart Cohn, Zvi Feiner, David Rosenberg, and Avi Fox each have moved to dismiss plaintiffs' amended complaint on numerous grounds. For the reasons stated below, the Court denies defendants' motions to dismiss, except for with respect to the derivative claims in Counts 2, 3, 6, and 7, which are dismissed with leave to amend.

## Background

The Court takes the following factual allegations from plaintiffs' amended complaint. Plaintiffs are shareholders of Ditto Holdings, Inc. Ditto (later renamed SoVesTech, Inc.) is a Delaware corporation that owns 100% of Ditto Trade, Inc. (previously FB Securities Corp.), a securities broker-dealer registered with the SEC.

Defendants are current or past officers or directors of Ditto. Cohn was Ditto's general counsel from its incorporation in 2010 until at least January 2016. He also was the company's original secretary. Avi Fox was one of the original members of Ditto's board of directors, along with his brother Joseph Fox, who is not named as a defendant

in this lawsuit.  In addition to serving as Ditto's chief compliance officer, Rosenberg became a member of the board in 2012.  It is unclear if he has since left the board and when.  Feiner has been a member of the board since 2013.  It is also unclear if and when Feiner has left the board.

In July 2013, Paul Simons joined Ditto's board.  Upon review of Ditto's records in preparation for an investor meeting, Simons became aware of a number of expenditures, transactions, and accounting irregularities that raised concerns about corporate mismanagement.  Simons outlined his concerns in a September 2013 letter to his fellow board members.  He enumerated the following suspect transactions between the period of January 2012 through July 2013:

- payments of approximately $170,000 to Joseph Fox's son, Jorden Fox, for rent, legal expenses, and the production of "Savaged the Movie";

- other payments to Joseph Fox and other Fox family members with no indicated or apparent business purpose;

- charges and cash withdrawals of almost $46,000 at various Las Vegas resorts and casinos for which Ditto did not have an apparent business purpose; and

- payments totaling $15,000 to a company owned by Cohn's son.

Simons's letter also raised concerns about Joseph Fox's 2013 sale of his own shares of stock at prices different from the price offered by Ditto, the company's failure to file tax returns since its incorporation, and the lack of appropriate internal controls or systems to record transactions.

Simons was removed from the board shortly after he sent the letter.  Ultimately,

the board of directors approved the use of company funds to sue him for defamation. Feiner replaced Simons on the board. Also in September 2013, the Financial Industry Regulatory Authority (FINRA) opened an investigation into the issues raised in Simons's letter. Ditto retained an outside law firm, Goldberg Kohn, to investigate the allegations in Simons's letter. Goldberg Kohn issued its final report to Ditto in January 2014.

Joseph Fox told Goldberg Kohn during its investigation that the payments to his family members were either advances under his employment agreement[1] or were draws against a line of credit extended to him by Ditto in consideration of his personal guaranty of investor loans and stock purchases. Goldberg Kohn accepted this explanation for the payments. Nonetheless, the Goldberg Kohn report concluded that Ditto had been operating on an "ad hoc undisciplined, nontransparent basis." Am. Compl. ¶ 70 (quoting Ex. B, at 6-8). The report further stated, "we do not condone operating a business in the manner in which it has been run to date," and it made several recommendations to help Ditto establish and comply with good corporate practices. *Id.* ¶ 71 (quoting Ex. B, at 8).

A February 2, 2014 email, signed by Rosenberg and Feiner and approved by Cohn, notified shareholders of the board's receipt of the Goldberg Kohn report. A copy of the report was not attached to the email. The email stated that the report "does not find any dishonest business practices, nor did it find any misappropriation or misuse of company funds." *Id.* ¶ 73 (quoting Ex. C). The email did not mention the report's

---

[1] Joseph and Avi Fox have asserted that they had written employment agreements with Ditto that authorized them to receive up to $250,000 per year in advancements, which could be treated as wages or loans.

condemnation of Ditto's lack of discipline and transparency.  The email also assured investors—falsely, plaintiffs allege—that Ditto had already adopted many of the improvements and controls recommended in the report.   Additionally, the February 2014 email included as an attachment a cash flow statement for 2010 through 2013, which the email characterized as containing details from Ditto's consolidated income statement.  The consolidated income statement itself was not attached to the email.  Plaintiffs allege that the omitted consolidated income statement would have revealed information about losses that "likely would have caused concern for shareholders and given them significant pause before investing further in the company."  *Id.* ¶ 78.

Plaintiff Myers became interested in investing in Ditto at the end of 2014.  On or about January 20, 2015, Myers met with representatives of Ditto in their Chicago office to discuss his potential investment.  During this meeting, Myers asked Joseph Fox and Cohn to provide him with a summary of the concerns raised by Simons and Ditto's planned response to those concerns.  Cohn also brought up the Goldberg Kohn report.  Joseph Fox told Myers the report was not available but said he would be happy to answer questions about it.  Myers contends that he was intentionally and falsely "led to believe by statements of Joseph and Cohn" that the Goldberg Kohn report provided no support for Simons's allegations of "financial malfeasance."  *Id.* ¶ 105.  Myers alleges that he was further misled during the meeting on whether Ditto had implemented any of the Goldberg Kohn report's recommendations.  Acting in reliance upon these misrepresentations and omissions, Myers says, he purchased $25,000 worth of Ditto stock in February 2015. He made additional purchases in March and April 2015.

Myers alleges that did not begin to become aware of Ditto's problems until he

obtained and read the Goldberg Kohn report in July 2015.  At that time, Myers says, he realized that he had been misled about Ditto's operation and its true financial condition. When he later obtained a copy of a 2012-2014 audit of Ditto, Myers says that he came to understand the extent to which information about Ditto's finances had been misrepresented and concealed from him prior to his decision to invest.

Plaintiffs allege that Ditto's persistent recordkeeping failures, defendants' issuance and approval of misleading emails to shareholders, and their failure to respond to calls for reform, among other failings, served to conceal and actively misrepresent the state of Ditto's operations and finances through 2015.  For example, plaintiffs contend that defendants approved another intentionally misleading email from Joseph Fox to shareholders on September 16, 2015.  Joseph Fox sent this September 2015 email shortly after the SEC issued orders finding that Joseph and Ditto had violated the Securities Act by selling securities without having filed a registration statement. According to plaintiffs, the email was misleading in its characterization of both the seriousness and the scope of the SEC's findings.

Concerned about Ditto's apparent misappropriation of shareholder funds, near the end of 2015, Wert hired an attorney to review Ditto and draft a letter detailing its ongoing problems and demanding significant changes to its structure and business operations.  Plaintiffs allege that Ditto did nothing in response.  Less than a month later, Joseph Fox informed shareholders that he was shutting down Ditto Trade, Ditto's subsidiary, because it was insolvent.

At present, Ditto's applications for patents on its proprietary trading technology are the only remaining assets of any value.  Due to inaction on the defendants' part,

however, the U.S. Patent and Trademark Office has since classified the most valuable of these patents as abandoned. Plaintiffs allege that Ditto stock is currently "worthless." *Id.* ¶ 143.

## Discussion

The Court will begin by addressing defendants' challenges to Count 1, the sole claim under federal law, before moving on to the state law claims (Counts 2 through 7).

### A. Rule 10b-5 securities fraud claim (Count 1)

Cohn seeks dismissal of Count 1, Myers's claim under SEC Rule 10b–5. Cohn argues that Count 1 fails to state a claim and that it is time-barred.

### 1. Failure to state a claim

On a motion to dismiss for failure to state a claim, the Court accepts the factual allegations in the amended complaint as true and draws reasonable inferences in favor of the plaintiff. *Alamo v. Bliss,* 864 F.3d 541, 548-49 (7th Cir. 2017). A claim is plausible on its face and thus survives a motion to dismiss "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where the plaintiff alleges fraud, as in this case, Federal Rule of Civil Procedure 9(b) requires the plaintiff to "state with particularity the circumstances constituting fraud." *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 869 (7th Cir. 2013) (quoting Fed. R. Civ. P. 9(b)). The level of particularity required depends on the facts of the case; typically, however, Rule 9(b) requires a description of the "who, what, when, where, and how" of the fraud. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (quoting *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Tr. v. Walgreen Co.*, 631

F.3d 436, 441-42 (7th Cir. 2011)). In addition, the Private Securities Litigation Reform Act (PSLRA) requires a securities fraud complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 834 (N.D. Ill. 2008) (quoting 15 U.S.C. § 78u–4(b)(1)-(2)).

Rule 10b–5 makes it unlawful, in connection with the purchase or sale of a security, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. To state a Rule 10b–5 claim, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013). For mere silence to be actionable under Rule 10b–5, the defendant must be under an affirmative duty to disclose. *Chiarella v. United States*, 445 U.S. 222, 230 (1980). Cohn challenges the sufficiency of Myers's 10b–5 claim with respect to three of the above elements: a material misrepresentation or omission by the defendant, scienter, and reliance.

First, Cohn contends that he was a secondary actor, an outside counsel to Ditto who owed Myers no duty to speak. Cohn maintains that for this reason, Myers's

allegations that he failed to correct misrepresentations that Joseph Fox made about the Goldberg Kohn report during their January 2015 meeting are insufficient to state a claim under Rule 10b–5, as Myers has not attributed any specific misrepresentations to Cohn himself. As a preliminary matter, plaintiffs allege that Cohn was Ditto's general counsel at the time in question, and the Court accepts that factual allegation as true for purposes of the present motion.[2] *See Alamo*, 864 F.3d at 548-49. There is no need, however, to reach the question of whether Cohn owed Myers an affirmative duty to disclose information about the Goldberg Kohn report and Ditto's response to it, because plaintiffs have adequately alleged that Cohn himself made misleading statements about the issue.

Myers alleges that, during a January 2015 meeting at which Joseph Fox and Cohn were also present, Myers sought information about Simons's allegations of financial misconduct and Ditto's plan for responding to the allegations. Am. Compl. ¶ 104. In replying, Cohn mentioned the Goldberg Kohn Report. *Id.* Fox added that the report was not available to shareholders due to ongoing litigation, but told Myers he would be "happy" to answer questions about it. *Id.* Myers alleges that although the Goldberg Kohn report in fact confirmed the financial irregularities highlighted by Simons, he "was led to believe by the statements of Joseph *and Cohn* that there was no support

---

[2] Cohn contends that his paragraph-long biography on the Rothman Law Group web page (attached as Exhibit 1 to plaintiffs' Motion for Approval of Alternative Form of Service, dkt. no. 7) does not list his role as general counsel for Ditto and thus establishes that he was not, in fact, Ditto's general counsel. Putting aside the fact that the non-listing does not actually prove this, it is inappropriate to resolve a factual dispute on a 12(b)(6) motion to dismiss. *See, e.g.*, *Cushing v. City of Chicago*, 3 F.3d 1156, 1163 (7th Cir. 1993).

for the Simons allegations of financial malfeasance" in the report. *Id.* ¶ 105 (emphasis added). Myers also alleges that "contrary to the statements that were made to [him]," Ditto had not followed any of the recommendations in the Goldberg Kohn report. He further alleges that Cohn knew that these statements were false. *Id.* ¶¶ 125-126. Thus contrary to Cohn's argument, plaintiffs *do* allege that he made misrepresentations (and not just omissions), and their complaint, though perhaps not a model of clarity, alleges the "who, what, when, where, and how" of the alleged fraud by Cohn with sufficient particularity.

Second, Cohn argues that Myers's allegations do not meet Rule 10b–5's scienter requirement. Under Rule 10b–5, scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). To prove scienter, a plaintiff must establish that the defendant knew that the statement at issue was false (or misleading due to a material omission) or was reckless in disregarding a substantial risk that it was false. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). In this context, recklessness is defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 704. In determining for purposes of a Rule 12(b)(6) motion whether scienter has been adequately alleged as required by the PSLRA, a court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323. As part of this inquiry, the court also must evaluate "plausible opposing inferences." *Id.*

Considered together, the facts alleged by Myers give rise to a strong inference of

scienter.  In response to Myers's questions about Simons's allegations of financial misconduct by Ditto, Cohn identified the Goldberg Kohn report.  Cohn is alleged to have been Ditto's general counsel, and as such it is more than reasonable to infer that he would have known the contents of the Goldberg Kohn report.  And for this reason, it is also reasonable to infer that Cohn would have understood the falsity or misleading nature of any statement to Myers suggesting that the report contained no support for Simons's allegations.  As the general counsel, it is likewise reasonable to infer that Cohn would have known that assurances that Ditto had implemented the report's recommendations were false or misleading.  By contrast, it would be quite unreasonable to infer that Cohn, as general counsel, lacked the requisite familiarity with the Goldberg Kohn report or Ditto's response to know or recklessly disregard the obvious risk that the representations that he and Joseph Fox are claimed to have made at the January 2015 meeting were false or misleading.

Lastly, Cohn argues that Myers failed to plausibly allege reliance.  According to Cohn, because Myers did not make his first purchase of Ditto stock until over a month after the January 2015 meeting, he had time to conduct additional, independent research on Ditto prior to making his purchase.  This is unpersuasive as a basis for dismissal under Rule 12(b)(6).  Myers says that he specifically asked about Simons's allegations and Ditto's response during the January 2015 meeting, and he had no opportunity to review the Goldberg Kohn report either then or at any time before he invested.  Joseph Fox informed him at that meeting that the report was "unavailable to shareholders."  Am. Compl. ¶ 104.  There is no basis in the current record to support an inference that there was anything else Myers could have discovered in the intervening

month (when, he says, even more false assurances were made) before he purchased Ditto stock.

In sum, Myers has sufficiently alleged facts that, if accepted as true, would allow reasonable inferences that Cohn (1) knowingly or recklessly (2) made one or more material misrepresentations in connection with the description of the Goldberg Kohn report during the January 2015, and that (3) Myers reasonably relied on those misrepresentations. The Court concludes that Myers has adequately alleged a Rule 10b–5 claim against Cohn.

### 2. Statute of limitations

Cohn also contends that Myers's Rule 10b–5 claim is barred by the applicable two-year statute of limitations. The running of the statute of limitations is an affirmative defense that plaintiffs need not anticipate and address in their complaint. *E.g.*, *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Although it is true that a court may still dismiss a claim under Rule 12(b)(6) if it is "indisputably time-barred," *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005), that is not the case here.

A private securities fraud suit "may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C § 1658(b). In *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), the Supreme Court held that the two-year limitations period in section 1658(b)(1) begins to run "once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Id.* at 653.

Myers was first named as a plaintiff in the amended complaint filed on June 7, 2017. He alleges that Cohn violated Rule 10b–5 during their January 20, 2015 meeting.

He also alleges that he did not even begin to discover the fraudulent nature of the representations made at the January 2015 meeting until July 2015, when he first obtained and read the Goldberg Kohn report.

Because five years have not passed since the alleged violation, section 1658(b)(2) does not bar Myers's claim. Section 1658(b)(1) likewise fails to bar the claim. Contrary to Cohn's assertion, the 2013 Simons letter could not have put Myers on notice of the alleged securities fraud, because it had not even been committed yet: Myers alleges that the fraudulent representations took place at a meeting on January 20, 2015. And there is no basis for a finding, based on the amended complaint alone, that Myers reasonably could have discovered the fraud between January 2015 and July 2015, when he first obtained the Goldberg Kohn report. Cohn is therefore not entitled to dismissal of Myers's Rule 10b–5 claim, because Myers asserted the claim in June 2017, within two years of his discovery of the facts constituting the violation.

**B.     Supplemental jurisdiction over state law claims (Counts 2-7)**

Defendants urge the Court to decline to exercise supplemental jurisdiction over plaintiffs' numerous state law claims (Counts 2-7). A district court has supplemental jurisdiction over any claims that are so related to the claims over which it has original jurisdiction such "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Claims that "derive from a common nucleus of operative fact" are part of the same case or controversy. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014). A district court may decline to exercise supplemental jurisdiction over a state law claim if it "raises a novel or complex issue of State law" or if it "substantially predominates" over the claim

for which the district court has original jurisdiction, among other reasons. 28 U.S.C. § 1367(c). In deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Myers's federal Rule 10b–5 claim and the state law claims form part of the same case or controversy. Although Myers's claim derives specifically from misrepresentations allegedly made to induce him to purchase Ditto stock, it shares with the state claims a common nucleus of facts regarding Ditto's financial condition, defendants' awareness of Ditto's financial condition, and their related acts and omissions. Moreover, contrary to Cohn's assertions, none of the state law claims raise novel or complex issues of state law that justify declining to exercise supplemental jurisdiction over them. Cohn bases his argument in this regard on his contention that he was outside counsel for Ditto: he contends the state law claims are novel because they impute to an "outside attorney" an unprecedented degree of responsibility. Cohn's Mem. in Supp. of Mot. to Dismiss at 4. This argument is misplaced here, because plaintiffs have alleged that he was Ditto's secretary and general counsel, and there is no basis for a contrary finding at this point.

Nor do the state law claims "substantially predominate" over the Rule 10b–5 claim in the way contemplated by section 1367(c). It is true that, as Cohn notes, Myers is the sole plaintiff named in the Rule 10b–5 claim and Cohn is now the only defendant. And the $125,000 Myers seeks in damages for the 10b–5 violation may be a fraction of

14

the total damages sought.  But the more important factor is the significant factual overlap between the Rule 10b–5 claim and the claims under state law.

The discovery required on these claims and the evidence offered to prove or disprove them can and will largely be done in common. For example, the question of what the defendants knew or should have known about the state of Ditto's financial operations is at issue on every claim.  If this Court were to decline to exercise supplemental jurisdiction over such claims, the result would be parallel, largely duplicative litigation at the state and federal level.  Considerations of judicial economy and convenience therefore weigh in favor of exercising supplemental jurisdiction over Counts 2 through 7 in this case.

## C.    Derivative claims in Counts 2, 3, 6, and 7

Defendants argue that the derivative claims in Counts 2, 3, 6, and 7 do not comply with the requirements of Federal Rule of Civil Procedure 23.1.  First, defendants argue that plaintiffs have failed to allege with particularity their efforts to obtain the "desired action" from defendants prior to suit, as required by Federal Rule of Civil Procedure 23.1(b)(3)(A).  A derivative plaintiff need not make a prior demand, however, "where facts are alleged with particularity which create a reasonable doubt that the directors' action was entitled to the protections of the business judgment rule."  *In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d 795, 807 (7th Cir. 2003) (quoting *Aronson v. Lewis*, 473 A.2d 805, 808 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).  In *Abbott Labs,* the court noted that the facts alleged raised an inference that the corporations' board members were aware of "long-term violations which had not been corrected."  *Id.* at 806.  The court found that

15

because plaintiffs alleged that the board consciously failed to act on known violations, they had sufficiently alleged a basis for a reasonable conclusion that the board's actions were unprotected by the business judgment rule. *Id.* at 809. Accordingly, the court held that plaintiffs' demand should have been excused under the demand futility doctrine. *Id.* Consistent with *Abbott Labs*, the Court finds that, by alleging that defendants consciously disregarded long-term, uncorrected violations, plaintiffs have sufficiently pleaded demand futility.

Defendants also cite plaintiffs' failure to allege that they were shareholders "at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). Defendants further note that plaintiffs also have failed to comply with the requirement that the complaint "allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack." Fed. R. Civ. P. 23.1(b)(2). The Court agrees that plaintiffs have failed to satisfy these particular requirements. Plaintiffs' verifications, filed on July 13, 2017, do not specifically allege that they were shareholders at the time of the violations, but instead merely state "I verify that I *am* a shareholder" of Ditto. Myers, Kincaid, Wert Verifications, dkt. nos. 80-82 (emphasis added). And neither the amended complaint nor plaintiffs' verifications allege that the action is not a collusive one to confer jurisdiction. The Court therefore dismisses Count 2 in its entirety and the derivative claims contained in Counts 3, 6, and 7 due to plaintiffs' failure to comply with the pleading requirements in Rule 23.1, with leave to amend.

## D. State law claims

### 1. Failure to state a claim

The Court addresses next defendants' contentions that plaintiffs' state law claims

fail to state a claim upon which relief may be granted. As a preliminary matter, the Court overrules Feiner's argument that plaintiffs have failed to state a claim against him because he did not join Ditto's board until September 2013, and Feiner contends that the matters alleged in these claims predate his tenure on the board. In fact, for each claim, plaintiffs allege, among others, acts and omissions that postdate September 2013 and implicate all of Ditto's board members, including Feiner. In addition, the Court does not address the factual disputes raised by Fox and Rosenberg (who are acting *pro se*) in their motions to dismiss. As noted earlier, at this stage of the case, the Court is required to accept plaintiffs' factual allegations as true.

### a.    Corporate waste (Count 2)

Defendants argue that plaintiffs have not sufficiently alleged acts or omissions that would constitute corporate waste. Delaware law defines corporate waste as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Brehm*, 746 A.2d at 263. A corporate waste claim typically involves a transfer of corporate assets that either "serves no corporate purpose" or for which "no consideration at all is received." *Id.*

Plaintiffs have adequately alleged facts permitting a reasonable inference that the Defendants are liable for corporate waste. For example, plaintiffs specifically allege that Defendants allowed the withdrawal and use of Ditto funds at Las Vegas resorts and casinos where the company had no legitimate business activities. Am. Compl. ¶¶ 43, 57, 147. Plaintiffs also allege that defendants loaned company funds to Cohn's son, who at the time was under SEC scrutiny for fraud, essentially as a favor to Cohn. *Id.* ¶

17

147.  Plaintiffs further accuse defendants of investing company funds in an unjustified defamation lawsuit against Paul Simons.  Accepting these facts as true, the Court could reasonably infer that defendants, as directors and officers of Ditto, engaged in transfers of corporate assets that served no corporate purpose.

### b.     Breach of fiduciary duty (Count 3)

Defendants likewise argue that plaintiffs have not sufficiently pleaded acts or omissions that would constitute a breach of fiduciary duty.  Delaware law requires a plaintiff to prove two elements to prevail on a breach of fiduciary duty claim:  (1) the existence of a fiduciary duty and (2) the defendant's breach of that duty.  *E.g.*, *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).  In *Malone v. Brincat*, 722 A.2d 5 (Del. 1998), the Delaware Supreme Court explained that directors must be honest in direct communications with shareholders about the corporation's affairs in order to comply with the fiduciary duties of due care, good faith and loyalty that they owe to shareholders.  *Id.* at 10.  Additionally, "[w]here directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  Corporate officers owe the same fiduciary duties of care and loyalty as directors.  *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

The Court takes as true for present purposes plaintiffs' allegations that the defendants were or are officers or directors of Ditto.  As such, they owed a fiduciary duty to Ditto and its shareholders.  In *Stone*, the Court found that a claim for breach of

the fiduciary duty of good faith was not stated where plaintiffs "acknowledged that the directors neither 'knew [n]or should have known that violations of law were occurring.'" *Stone*, 911 A.2d at 364. By contrast, plaintiffs in this case allege that defendants received, but ignored, demand letters detailing the alleged violations of law; they do not concede that defendants did not know about the violations. *See* Am. Compl. ¶ 153. *Caremark*, which describes the claim of directorial liability in that case as "predicated upon ignorance of liability creating activities within the corporation," is likewise distinguishable from this case. *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996). Plaintiffs have plausibly alleged facts that would allow a reasonable inference that defendants breached their fiduciary duties, specifically by issuing or approving intentionally misleading shareholder communications and "ignoring and failing to act upon two significant demand letters from shareholders" regarding Ditto's financial mismanagement in the face of a known duty to act. Am. Compl. ¶ 153.

### c. Fraudulent misrepresentation (Count 4) and fraudulent concealment (Count 5)

Defendants argue that plaintiffs have failed to allege facts sufficient to make out a claim for fraudulent misrepresentation or fraudulent concealment. Though lawyers in Illinois commonly assert these as separate claims, they really aren't; a claim of fraudulent misrepresentation encompasses fraudulent concealment. *See McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 805 (N.D. Ill. 2013). Under Federal Rule of Civil Procedure 9(b), a plaintiff alleging fraud must allege with particularity the circumstances constituting fraud. *E.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). Under Illinois law, which all parties rely upon, a plaintiff must allege the following five elements to state a

claim for fraud: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996). To state a claim for fraudulent concealment, the plaintiff must additionally allege that the defendant "concealed a material fact when he was under a duty to disclose that fact" to the plaintiff. *Id.* at 500, 675 N.E.2d at 593. A duty to disclose all material facts exists if, among other things, the defendant has a fiduciary relationship with the plaintiff. *Id.*

Although Cohn argues that plaintiffs have failed to plead facts that satisfy "even one" of the elements of fraudulent misrepresentation, he does not elaborate on this contention. Cohn's Mem. in Supp. of Mot. to Dismiss at 18. Instead, he contends only that he owed investors no duty to speak and that plaintiffs have not identified any facts concealed from them that were material to any decision they made.

Both arguments fail. First, the only case Cohn cites in support of his argument that he had no duty to speak to investors is *Rosenbaum v. White*, 692 F.3d 593 (7th Cir. 2012). That case involved outside attorneys hired by a company to draw up certain formation documents; they were not directors or officers of the company or the company's general counsel. *Id.* at 595-96. Because plaintiffs allege Cohn was Ditto's general counsel and secretary, *Rosenbaum* has no bearing on this case. Second, plaintiffs allege that defendants issued or approved intentionally misleading shareholder communications that mischaracterized the contents of the Goldberg Kohn report. Am. Compl. ¶¶ 73-74. They also allege that defendants actively concealed the report and its

contents from shareholders. *Id.* ¶ 167. Plaintiffs further allege that defendants "knew the . . . report was highly critical of the way the Company was operating." *Id.* ¶ 125. They also allege that defendants misrepresented and concealed the material fact of Ditto's true financial condition for the purpose of inducing company investors to "purchase and/or keep" Ditto stock, and that company investors purchased or held stock in reliance on this. *Id.* ¶¶ 160-161, 167-168. As previously noted, plaintiffs allege that defendants are or were Ditto officers or directors with fiduciary duties to the company and its shareholders. *Gantler*, 965 A.2d at 708-09. Taken together, these factual allegations are stated with sufficient particularity to make out plausible claims for fraudulent misrepresentation and fraudulent concealment.

### d. Negligent misrepresentation (Count 6)

Defendants also maintain that plaintiffs have not alleged facts sufficient to state a claim for negligent misrepresentation. A claim of negligent misrepresentation shares many of the same elements as a fraudulent misrepresentation claim. *Bd. of Educ. v. A, C & S, Inc.*, 131 Ill. 2d 428, 452, 546 N.E.2d 580, 591 (1989). The differences are that, for negligent misrepresentation, the defendant does not need to know that the statement in question is false; "[h]is own carelessness or negligence in ascertaining its truth will suffice." *Id.* Additionally, a plaintiff alleging negligent misrepresentation must allege that "the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* As previously noted, where a fiduciary relationship exists between a plaintiff and a defendant, the defendant is under a duty to disclose all material facts. *Connick*, 174 Ill. 2d at 500, 675 N.E.2d at 593.

Based on the same set of facts alleged in connection with plaintiffs' fraudulent

misrepresentation and concealment claims, plaintiffs have stated a claim for negligent misrepresentation.

### e. Legal malpractice (Count 7)

Cohn argues that plaintiffs have failed to state a claim against him for legal malpractice (Count 7). First, he asserts that as individual shareholders, plaintiffs did not have and thus cannot allege the requisite attorney-client relationship with Cohn. Cohn also argues that plaintiffs do not allege he breached any duty owed to Ditto. Plaintiffs make no response to Cohn's first argument and thus have effectively conceded the point for purposes of the present motion. Instead, they focus on the fact that they assert the legal malpractice claim as a derivative claim. Plaintiffs' Resp. to Motion to Dismiss 15.

Illinois law requires a plaintiff bringing a legal malpractice claim to allege the following:

> (1) an attorney/client relationship, (2) a duty owed by the defendant to the plaintiff arising out of that relationship, (3) a breach of that duty on the part of the defendant, (4) a proximate causal relationship between the defendant's breach of duty and the damages sustained by the plaintiff, and (5) damages.

*Majumdar v. Lurie*, 274 Ill. App. 3d 267, 270, 653 N.E.2d 915, 918 (1995).

The Court focuses on plaintiffs' assertion of the legal malpractice on a derivative basis. They allege that Cohn was Ditto's lawyer. Am. Compl. ¶ 177. They also allege that as Ditto's attorney, Cohn owed the company a duty to act in its best interest. *Id.* Plaintiffs assert that Cohn breached this duty by, among other things, failing to ensure that Ditto complied with "basic legal obligations" including the filing of annual tax returns and maintenance of typical books and records. *Id.* ¶ 178. Plaintiffs also point to Cohn's

alleged approval of a loan of company funds to Cohn's son when it had "no purpose related to Company business" and Cohn's failure to protect one of Ditto's patent applications from being abandoned. *Id.* Although plaintiffs do not expressly state that Ditto (as opposed to the plaintiffs themselves as shareholders) suffered injury as a result of Cohn's alleged malpractice, this is reasonably inferred from plaintiffs' allegations that Ditto's stock is now "worthless due to Defendants' active concealment of the true facts regarding the financial condition of the Company, the manner in which its business was conducted, and the deceptive acts and mismanagement of the Company and its officers and directors." *Id.* ¶ 143. Plaintiffs also allege that they have had to pay attorneys' fees to protect Ditto's patents as a result of Cohn's failure to do so. *Id.* ¶ 179. In sum, plaintiffs' allegations are sufficient to make out a derivative legal malpractice claim asserted on Ditto's behalf.

### 2.    Statute of limitations

Defendants argue that each state law claim is time-barred. As previously noted, a court may dismiss a claim under Rule 12(b)(6) if it is "indisputably time-barred," *Small*, 398 F.3d at 898.

### a.    Corporate waste and breach of fiduciary duty (Counts 2 & 3)

Plaintiffs' corporate waste (Count 2) and breach of fiduciary duty (Count 3) claims are brought under Delaware law. Defendants assert that Counts 2 and 3 are subject to Delaware's three-year statute of limitations and are therefore time-barred. *See* 10 Del. Code § 8106 ("[N]o action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action."). Plaintiffs argue

that Illinois' catch-all five-year statute of limitations governs instead. 735 ILCS 5/13-205 ("[A]ll civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued.").

A federal court hearing state law claims under supplemental jurisdiction applies the choice of law rules of the state in which it sits. *McCoy*, 760 F.3d at 684. In Illinois, statutes of limitations are procedural matters governed by the law of the forum. *Newell Co. v. Petersen*, 325 Ill. App. 3d 661, 669, 758 N.E.2d 903, 908 (2001). This is the case even where the relevant cause of action is governed by another state's substantive law, unless Illinois' borrowing statute applies. *See Kalmich v. Bruno*, 553 F.2d 549, 553 (7th Cir. 1977). The borrowing statute is triggered if (1) the cause of action arose in another state, (2) that state's statute of limitations would bar the action, and (3) none of the parties were Illinois residents at the time the cause of action accrued. 735 ILCS 5/13-210; *Newell Co.*, 325 Ill. App. 3d at 685, 758 N.E.2d at 921.

In this case, the borrowing statute is inapplicable because several of the parties are Illinois residents and one can safely assume they were residing in Illinois when their claims accrued.

For these reasons, the Court concludes that Illinois' five-year statute of limitations applies. 735 ILCS 5/13-205; *see also Havoco of Am., Ltd. v. Sumitomo Corp. of Am.*, 971 F.2d 1332, 1337 (7th Cir. 1992) (applying Illinois' five-year statute of limitations to a claim for breach of fiduciary duty); *In re Gaslight Club, Inc.*, 167 B.R. 507, 518 (Bankr. N.D. Ill. 1994) ("A five year limitation of actions applies to claims for fraud, breach of fiduciary duty, intentional interference with valid business relations and waste of corporate assets."). The limitations period begins to run "when the plaintiff knows or

reasonably should know of his injury and knows that it was wrongfully caused."

*McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 585 (7th Cir. 2000) (citing

*Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 77, 651 N.E.2d 1132

(1995)).

Plaintiffs' corporate waste and breach of fiduciary duty claims are not time-

barred. Much of the activity that plaintiffs allege constitutes corporate waste and a

breach of fiduciary duty took place after January 2012, within five years of plaintiffs'

filing of the original January 12, 2017 complaint. Moreover, as defendants themselves

note, Simons did not "blow the whistle" to shareholders about this activity until

September 11, 2013. There is no indication (and defendants advance no argument)

that plaintiffs reasonably should have known of the alleged violations prior to that date.

Accordingly, Counts 2 and 3 are not time-barred.

> **b.  Fraudulent misrepresentation, fraudulent concealment.**
> **and negligent misrepresentation (Counts 4-6)**

Defendants argue that Counts 4 through 6 are time-barred. Feiner's assertion

that Delaware's statute of limitations applies to these claims is incorrect; as previously

explained, Illinois law governs procedural matters, which include statutes of limitation.

Although Cohn acknowledges that the statute of limitations for fraud claims in Illinois

typically is five years, he contends that the limitations period for common-law causes of

action arising out of securities transactions is only three years, the limitations period

contained within the Illinois Securities Law. *See* 815 ILCS 5/13(D).

In support of his argument that this three-year statute of limitations applies, Cohn

cites *Tregenza v. Lehman Brothers,* 287 Ill. App. 3d 108, 678 N.E.2d 14 (1997). In

*Tregenza*, the plaintiff sued Lehman Brothers for breach of fiduciary duty, fraud, and

negligent misrepresentation arising out of its sale of stock to the plaintiff.  *Id.* at 109, 678 N.E.2d at 14.  Even though the plaintiff did not bring any claim under the Illinois Securities Law, the court held that the statute's three-year statute of limitations applied, because the plaintiff's claims were "reliant upon . . . matters for which relief is granted by the Securities Law."  *Id.* at 110, 678 N.E.2d at 15 (internal quotation marks omitted).

Plaintiffs cite *Carpenter v. Exelon Enterprises Co.*, 399 Ill. App. 3d 330, 927 N.E.2d 768 (2010), and *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669 (7th Cir. 2007), for the proposition that a common law claim must actually be cognizable under the Illinois Securities Law in order for its three-year statute of limitations to apply.[3] According to plaintiffs, the Securities Law provides a remedy only for the *sale* of a security made in violation of the law, and "Myers is the only Plaintiff whose claims, in part, arise out of the sale of a security."  Plaintiffs' Resp. to Motion to Dismiss at 21. Plaintiffs assert that Wert and Kincaid's claims are based, not on their purchases of Ditto stock, but on defendants' allegedly fraudulent or negligent provision of false or misleading information to induce them to hold onto their shares.  *Id.*

In reality, the amended complaint is less than clear on this point.  Plaintiffs allege that they were induced "to purchase *and/or keep*" Ditto shares based on fraudulent misrepresentations.  Am. Compl. ¶¶ 159, 171 (emphasis added).  With respect to the fraudulent concealment claim, plaintiffs allege that it took place "[i]n connection with

---

[3] Those cases dealt specifically with the question of whether a claim by a seller of securities was subject to the three-year statute of limitations.  Although *Carpenter* and *Klein* reached opposite results, in each case, the court's analysis hinged on whether Section 13 of the Illinois Securities Law provided a remedy to plaintiff sellers of securities, and not just to purchasers.  *Klein*, 500 F.3d at 672-73; *Carpenter*, 399 Ill. App. 3d at 337-40, 927 N.E.2d at 774-77.

offering shares of the Company for sale to plaintiffs and other prospective and existing

Company investors." *Id.* ¶ 161.  Plaintiffs further contend that such concealment

prevented them from making informed decisions about "whether or not to purchase

*and/or retain* their stock in the Company."  *Id.* ¶ 166 (emphasis added).

   *Tregenza*, *Carpenter*, and *Klein* are all distinguishable because, in each of those

cases, whether the plaintiff was a seller or a purchaser, the plaintiff's claim still arose

from a sale of stock.  On its face, section 13 of the Illinois Securities Law applies only to

the sale of a security.  815 ILCS 5/13(a) ("Every sale of a security made in violation of

the provisions of this Act shall be voidable . . .").  Insofar as plaintiffs' claims are, as they

allege, unrelated to the sale of Ditto stock but instead (or also) involve their decision to

retain stock, their claims are not reliant upon "matters for which relief is granted" by

section 13 of the Illinois Securities Law, and its three-year statute of limitations could not

possibly apply.  Thus, at least where plaintiffs' claims do not arise from the sale of a

security, the general five-year statute of limitations governs.  As was the case with

Counts 2 and 3, plaintiffs allege violations under Counts 4 through 6 that took place well

within the applicable five-year period.  Am. Compl. ¶¶ 160, 167, 173.  Lastly, Myers's

claims that arise out of a sale of securities were timely filed within three years of when

he purchased Ditto stock.  The Court therefore declines to dismiss Counts 4 through 6

based on the statute of limitations.

### c.      Legal malpractice (Count 7)

   Cohn argues that the applicable two-year statute of limitations has already run on

plaintiffs' legal malpractice claim (Count 7).  The parties agree that the applicable

statute of limitations is supplied by 735 ILCS 5/13-214.3(b), which provides that a legal

malpractice claim must be commenced "within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought."  735 ILCS 5/13-214.3(b).  Plaintiffs allege that they could not reasonably have discovered Cohn's alleged malpractice "until long after his actions due to the active concealment of the true facts."  Am. Compl. ¶ 180.  Specifically, plaintiffs note that the Goldberg Kohn report, which detailed several of their complained of injuries, was not made public until April 2015.

Plaintiffs' claims cannot be dismissed on statute-of-limitations grounds.  Based on the complaint alone, there is no basis for a determination that plaintiffs or other shareholders reasonably should have known of the allegedly false and misleading nature of the February 2, 2014 email's characterization of the Goldberg Kohn report before they gained access to the report itself.  Plaintiffs' original complaint was filed within two years of the release of the Goldberg Kohn report.

**E.    The exculpatory clause**

Lastly, Feiner argues that the exculpatory clause in Ditto's articles of incorporation bars plaintiffs' corporate waste and breach of fiduciary duty claims (Counts 2 and 3).  Plaintiffs make two arguments in response.  First, plaintiffs assert that the articles of incorporation are not properly before the Court and should not be considered on a Rule 12(b)(6) motion.  Second, plaintiffs contend that if the Court considers the articles, under Delaware law, the exculpatory provision does not excuse allegations of bad faith or breach of loyalty, both of which are specifically alleged as part of the corporate waste and breach of fiduciary duty claims.

The Court need not deal with plaintiffs' first contention because their second is

plainly correct.  Under Delaware law, directors are not protected by an exculpatory provision that purports to eliminate or limit their personal liability for breach of fiduciary duty if a plaintiff has alleged facts permitting a reasonable inference of a breach of loyalty or good faith.  *In re Abbott Labs. Derivative Shareholders Litig.*, 325 F.3d at 810; *Emerald Partners v. Berlin*, 726 A.2d 1215, 1227 (Del. 1999).  Delaware courts have categorized allegations of corporate waste as involving bad faith.  *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005), ("The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith."), *aff'd,* 906 A.2d 27 (Del. 2006).  Moreover, as previously noted, plaintiffs' claims involve allegations of breach of the duty of loyalty.  Thus the exculpatory clause does not protect defendants here.

## Conclusion

For the foregoing reasons, the Court grants defendants' motions to dismiss in part.  Specifically, the Court dismisses the derivative claims in Counts 2, 3, 6, and 7 with leave to file an amended complaint within 14 days but otherwise denies defendants' motions to dismiss [dkt. nos. 70, 74, 76, & 77].  The case is set for a status hearing on September 11, 2017 at 9:30 a.m. for the purpose of setting a discovery and pretrial schedule.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 1, 2017