**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAWRENCE J. WERT,<br>RICHARD D. KINCAID, and<br>JAMES O. MYERS, individually<br>and derivatively on behalf<br>of Ditto Holdings, Inc., | ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| **Plaintiffs,** | ) <br> ) | |
| **vs.** | ) <br> ) | **Case No. 17 C 219** |
| STUART COHN, ZVI FEINER,<br>DAVID JONATHAN ROSENBERG,<br>and AVI FOX, | ) <br> ) <br> ) <br> ) | |
| **Defendants.** | ) <br> ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this suit are shareholders of Ditto Holdings, Inc. who have sued members of Ditto's board of directors and its general counsel in connection with alleged mismanagement, fraud, and concealment of the company's finances and operations. Plaintiffs allege that they made new investments or retained existing investments in Ditto based on the defendants' misrepresentations and omissions regarding the company's financial condition. Plaintiffs also allege that the defendants knew about and failed to prevent the gross mismanagement of Ditto's finances by Joseph Fox, a Ditto director who is not a party to this suit.

The second amended complaint includes seven claims, each of which was brought by one or more of the three plaintiffs in their individual and/or derivative capacities. Count 1, the only federal claim in the complaint, alleges that defendant

Stuart Cohn violated federal securities law by making fraudulent representations to one of the plaintiffs, James Myers, in connection with Myers's purchase of Ditto stock. Counts 2 and 3 allege corporate waste and breach of fiduciary duty under Delaware law. Counts 4, 5, and 6 allege Illinois common-law fraudulent and negligent misrepresentation and concealment. Count 7 alleges that Cohn committed legal malpractice.

Each of the defendants previously moved to dismiss the action for failure to state a claim. The Court denied those motions, finding that the allegations in the complaint, if taken as true, stated a claim upon which relief could be granted. *See Wert v. Cohn*, No. 17 C 219, 2017 WL 3838098 (N.D. Ill. Sept. 1, 2017). The plaintiffs and Ditto's former general counsel, Stuart Cohn, recently settled all of the claims against him, eliminating counts 1 and 7 from the case. The remaining defendants—Zvi Feiner, David Rosenberg, and Avi Fox—have now filed separate motions for summary judgment on counts 2 through 6.[1] For the reasons below, the defendants' motions are granted.

## Background

### A.    Ditto's history

Ditto Holdings, Inc.[2] is a Delaware corporation that owns 100% of Ditto Trade, Inc., a securities broker-dealer registered with the SEC. The company sought to leverage proprietary software to generate profit though real-time market trading. The defendants are Ditto's general counsel and members of its board of directors. Cohn

---

[1] Avi Fox's motion, discussed further below, seeks partial summary judgment.

[2] The holding company was later renamed SoVesTech, Inc. For present purposes, the Court will refer to the holding company as Ditto because that was its names at all times relevant here. The Court will refer to the subsidiary as Ditto's subsidiary or Ditto Trade.

was Ditto's general counsel from its incorporation in 2010 until at least January 2016. Avi Fox was one of the original members of the company's board of directors, along with his brother Joseph Fox (who is not a named defendant in this suit, but who is discussed extensively below). Defendant Jonathan Rosenberg was chief compliance officer for Ditto's fully owned subsidiary, Ditto Trade, before becoming a member of the Ditto Holdings board of directors in December 2012. Defendant Zvi Feiner became a member of the board in September 2013. As noted above, the plaintiffs—Myers, Stuart Wert, and Richard Kincaid—are Ditto investors.

In late 2012 and early 2013, Ditto was growing. Although it had started as a shoe-string operation, Rosenberg reports that Ditto started using an outside payroll service, hired a human resources director, and sought an experienced CEO, among other reforms, with the intent of formalizing some of the relatively slipshod systems that had been put in place during the company's nascence. It is undisputed that during this period the company hired Paul Simons to be its new CEO. Simons was elected to Ditto's board in July 2013.

In his new role, Simons undertook to review the company's records in preparation for an investor meeting. During this review, he discovered a number of expenditures, transactions, and accounting irregularities that raised concerns about corporate management. Simons outlined these concerns in a September 2013 letter to the board. In the letter, he highlighted the following suspect transactions from the period between January 2012 and July 2013:

- Payments of about $170,000 to Joseph Fox's son, Jorden Fox, for rent, legal expenses, and production of "Savaged the Movie";

- Other payments to Joseph Fox and members of his family with no

apparent business purpose;

- Charges and cash withdrawals of almost $36,000 at various Las Vegas resorts and casinos for which Ditto did not have a stated or apparent business purpose; and

- Payments totaling $15,000 to a company owned by Cohn's son.

Simons's letter also raised concerns about Joseph Fox's 2013 sale of his own shares of Ditto stock at prices lower than those offered by Ditto, the company's failure to file tax returns, and the lack of appropriate internal controls or systems to record transactions.

Simons was immediately removed from his role as CEO and his position on the board of directors. He proceeded to sue Ditto. *See Simons v. Ditto*, No. 14 C 309 (N.D. Ill.). There appears to be some disagreement about whether the board was already in the process of firing Simons at the time that he sent the letter or whether the firing was in response to his allegations, but that dispute is immaterial for present purposes because the parties agree that Simons's letter set several important events in motion. First, the board voted to use company funds to pursue a counterclaim for defamation against Simons. Second, Feiner was elected to replace Simons on the board of directors. Third, the Financial Industry Regulatory Authority (FINRA) opened an investigation into the issues raised in Simons's letter. Finally, and most importantly with regard to the underlying suit, the board created a special committee, chaired by Rosenberg, to investigate Simons's allegations. According to Rosenberg, he promptly interviewed several law firms in his capacity as chair of the new special committee in search of one that could conduct an independent investigation of the allegations in Simons's letter. Rosenberg ultimately retained Goldberg Kohn on behalf of Ditto to conduct the review. The Goldberg Kohn report, the final version of which was issued to Ditto in January 2014, forms the basis for several of the allegations in the present suit.

Joseph Fox's conduct was front and center in the Goldberg Kohn report. Joseph Fox told investigators that the payments to his family members identified in the Simons letter were either advances under his employment agreement or were draws against a line of credit extended to him by Ditto in consideration of his personal guaranty of investor loans and stock purchases. Goldberg Kohn accepted this explanation for the payments. Nonetheless, the Goldberg Kohn report concluded that Ditto had been operating on an "ad hoc undisciplined, nontransparent basis." Ex. B to 2d Am. Compl., dkt. no. 93-2, at 6. The report further stated that "we do not condone operating a business in the manner in which it has been run to date," before making several recommendations designed to help Ditto establish and comply with good corporate practices. *Id.* at 8.

On February 2, 2014, shortly after receiving the report, the Ditto board of directors circulated an e-mail addressed to shareholders notifying them that the board had received the Goldberg Kohn report and assuring them that the report had not found "any dishonest business practices" nor "any misappropriation or misuse of company funds." Ex. C to 2d Am. Compl., dkt. no. 93-3. The e-mail, which was signed by Feiner, Rosenberg, and Joseph Fox, did not include the report itself. The e-mail also failed to mention Goldberg Kohn's admonitions about Ditto's lack of discipline and transparency. The e-mail further assured investors—falsely, the plaintiffs allege—that Ditto had already adopted many of the improvements and controls recommended in the report. Finally, the e-mail included cash flow statements for 2010 through 2013 but omitted Ditto's consolidated income statement, which the plaintiffs allege would have revealed information about losses that would have caused shareholders concern and led to

reticence about continued or further investment.

Critically, however, the parties disagree about whether that e-mail was ever sent. The defendants contend that the e-mail was drafted by outside counsel and circulated for board consideration but that the board did not ultimately send it. The plaintiffs point to testimony from Myers that they contend shows that shareholders received the e-mail.

It was not until late 2014, many months after the Goldberg Kohn report was released to the board, that plaintiff Myers became interested in investing in Ditto stock. In January 2015, Myers met with representatives of Ditto in their Chicago office to discuss his potential investment. Myers allegedly asked Joseph Fox to provide him with a summary of the concerns raised by Simons and Ditto's planned response to those concerns. He purportedly also asked about the Goldberg Kohn report. Joseph Fox responded that the report was unavailable due to ongoing litigation but offered to answer questions about it. Myers contends that he was intentionally and falsely misled by Joseph Fox and Cohn to believe that the Goldberg Kohn report provided no support for Simons's allegations of financial malfeasance and that Ditto had already implemented the report's recommendations. Myers says that, in reliance upon these representations and omissions, he purchased $25,000 of Ditto stock in February 2015 and purchased additional stock in March and April 2015.

Finally, relevant later, Ditto's corporate charter includes a provision exculpating directors from certain liability. The exculpatory provision—which closely tracks the language authorized by Del. Code Ann. tit. 8, § 102(b)(7)—states in relevant part that:

> A director of the corporation shall not be personally liable to the
> corporation or its stockholders for monetary damages for breach of
> fiduciary duty as a director except for liability (i) for any breach of the
> director's duty of loyalty to the corporation or its stockholders, (ii) for acts

or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of Delaware, or (iv) for any transaction from which the director derived any improper personal benefit.

Ex. 1 to Feiner's L.R. 56.1 Stat., dkt. no. 175-1, at ¶ 11. Because the allegations against them focus largely on inaction, the defendants claim that the exculpatory clause is dispositive of some of the plaintiffs' claims.

## B.     This suit

Simons sent his letter in September 2013, setting in motion many of the events described above. Myers, who had not yet invested at the time of Simons's allegations, says that he first became concerned about Ditto's management in July 2015 when he finally got ahold of the Goldberg Kohn report. Plaintiff Wert says that he too became concerned about Ditto's apparent misappropriation of shareholder funds and, near the end of 2015, hired an attorney to review Ditto's financials and draft a letter to the board. The Wert letter, which was ultimately sent to the board in November 2015, detailed Wert's concerns about Ditto's management and demanded significant changes to its structure and business operations. Plaintiffs allege that Ditto did nothing in response.

Less than a month later, Joseph Fox informed shareholders that he was shutting down Ditto Trade, Ditto's fully owned subsidiary, because it was insolvent. Ditto's patents and pending patent applications on its proprietary trading technology are its only remaining assets of value. Ditto's stock is currently worthless.

The plaintiffs filed this lawsuit in January 2017. The second amended complaint recites a list of allegations of wrongdoing by Joseph Fox. According to the plaintiffs, he used Ditto as a personal piggy bank. But this is a suit against other members of Ditto's board of directors and general counsel. The Court therefore focuses on the claims for

relief actually contained in the plaintiffs' complaint.

Count 1, the only claim sounding in federal law, was brought by Myers in his individual capacity and alleges that Ditto's former general counsel, Cohn, violated sections 10(b) and 20(a) of the Security Exchange Act and Securities and Exchange Commission (SEC) Rule 10b-5 by fraudulently inducing Myers to purchase Ditto stock.[3] Count 2, brought against all of the defendants by the plaintiffs exclusively in a derivative capacity, alleges corporate waste under Delaware law. Count 3, brought by the plaintiffs both individually and derivatively against all of the defendants, alleges that the defendants breached their fiduciary duties to Ditto's shareholders under Delaware law. Counts 4 and 5 allege Illinois common-law fraudulent misrepresentation and concealment by each of the defendants; these claims were brought by each of the plaintiffs in his individual capacity. Count 6 was brought by the plaintiffs on both an individual and derivative basis and alleges Illinois common-law negligent misrepresentation by each defendant. Finally, as noted above, count 7 alleges legal malpractice against Cohn.

The defendants previously moved to dismiss the plaintiffs' claims. Those motions were, for the most part, denied. *See Wert*, 2017 WL 3838098, at *1. Taking the allegations in the complaint as true, as it was required to in evaluating a motion to dismiss, *id.* at *3, the Court concluded that the plaintiffs had in fact alleged a set of facts under which the defendants could have been liable, *id.* at *12. The Court did, however,

---

[3] Although the second amended complaint is less than clear about against whom count 1 was directed, the plaintiffs later clarified that it was directed only to Cohn in his individual capacity. *See* Pls.' Br. in Opp'n to Defs.' Mots. to Dismiss, dkt. no. 79, at 3 n.2.

dismiss without prejudice the derivative claims in the complaint for failure to allege certain facts necessary to support derivative claims. *Id.* at *7. The plaintiffs then filed their second amended complaint, which cured the pleading issues identified by the Court.

The Court recently approved a settlement between the plaintiffs and Cohn that resolved the claims against him. *See* Order Granting Final Approval of Revised Settlement, dkt. no. 242. Because counts 1 and 7 were brought only against Cohn in his individual capacity, they are no longer part of the case.

With this background in mind, the Court turns to the three remaining named defendants—Feiner, Avi Fox, and Rosenberg.

### 1. Feiner's role

Zvi Feiner joined Ditto's board of directors in the days following Simons's acrimonious departure in September 2013. The parties appear to agree that Feiner did not do very much as a board member. The plaintiffs assert that Feiner was willfully blind to Ditto's mismanagement and accordingly accuse him of corporate waste and breaching his fiduciary duty. They also contend that Feiner is liable on the misrepresentation and concealment claims because he participated in a "general pattern of directors misrepresenting and concealing facts regarding the financial status of the company." Pls.' Br. in Opp'n to Feiner's Mot. for Summ. J., dkt. no. 190, at 7. The only specific communication the plaintiffs identify, however, is the February 2014 e-mail addressed to shareholders that they say misrepresented the findings of the Goldberg Kohn report. (As discussed further below, the parties dispute whether the e-mail was ever sent.)

Feiner, on the other hand, says he never felt like he had enough information or independence to fully participate on the Ditto board. And when he attempted to gather information about Ditto's response to Simons's allegations, Feiner says, Joseph Fox minimized their importance and suggested that Feiner had nothing to worry about. Feiner also emphasizes that he personally invested nearly a million dollars in Ditto and thus had every incentive to ferret out any misconduct by Joseph Fox, had he been aware of warning signs.

In short, Feiner casts his own conduct as an innocent, if perhaps negligent, inattention. The plaintiffs, on the other hand, characterize his actions as reckless, if not intentional, enablement of Joseph Fox's misconduct, sufficient to render him liable.

## 2. Avi Fox's role

Avi Fox was a member of Ditto's board of directors from the company's inception. He admits to having, at one point, been very involved with Ditto; the key dispute is about *when* he was a member of the board. Avi Fox testified that he left the board of directors at the end of December 2012 to begin intensive treatment for leukemia. In support of his assertion, he points to his own deposition testimony (discussed further below), a letter from one of his physicians roughly corroborating the timing of his diagnosis, and an e-mail including the slate of candidates up for election to the Ditto board sent on December 27, 2012 that did not include his name. Rosenberg's testimony also supports Avi Fox's representations about the timing of his departure. *See, e.g.*, Rosenberg Dep., Ex. D to Pls.' L.R. 56.1 Stat., dkt. no. 239-4, at 72:19-22; 73:1-9 ("I replaced Avi Fox on the board.").

Notably, Avi Fox's motion for summary judgment is more limited than Feiner's

and Rosenberg's.  He seeks only partial summary judgment regarding events that occurred after he says he left the board.  The plaintiffs oppose the motion, disputing whether Avi Fox ever left the Ditto board.  They point to the fact that Avi received payments from Ditto during 2013 and 2014 and note that he opposed their proposed settlement with Cohn on the basis that he (Fox) was owed money for the same years.

Substantively, the allegations against Avi Fox are very similar to those against Feiner.  That is, the plaintiffs allege that, during his time as director, Avi Fox intentionally enabled Joseph Fox to loot Ditto—allegedly making him liable for corporate waste and breach of his fiduciary duty (counts 2 and 3)—and failed to correct misrepresentations made to investors by Joseph Fox and others, which they say amounted to fraudulent or negligent misrepresentation or concealment (counts 4, 5, and 6).

### 3.    Rosenberg's role

Rosenberg was first elected to the Ditto board in December 2012.  Specifically, he has testified that he replaced Avi Fox on the board.  Before his election, Rosenberg served as chief compliance officer for Ditto's subsidiary, Ditto Trade.  He too is accused of having intentionally ignored warning signs of Joseph Fox's misconduct in order to enable the looting of the company.  And, like Feiner, Rosenberg allegedly misrepresented the state of the company to shareholders and failed to correct statements that he knew to be untrue.

But, at least as they relate to corporate waste and breach of duty, Rosenberg's circumstances are significantly different from Feiner and Avi Fox's.  Namely, it is undisputed that he was heavily involved with Ditto at all times relevant to this case.  The plaintiffs allege that Rosenberg received but ignored many warning signs that Joseph

Fox was mismanaging the company and knew in his capacities as chief compliance officer for Ditto's subsidiary, Ditto Trade, and then a member of Ditto's board that the company had utterly inadequate bookkeeping and other internal controls. Rosenberg admits that he indeed became aware of problems with the company's management after he joined the board of directors. But he asserts that he acted quickly and diligently to address the problems. For instance, he points to his actions establishing the special committee to review the allegations contained in the Simons letter and to his hiring of Goldberg Kohn to conduct an independent review of the company's management.

Rosenberg is similarly situated to Feiner, however, when it comes to the misrepresentation and concealment claims. Specifically, there are no allegations nor evidence suggesting that Rosenberg made direct representations to the plaintiffs other than the disputed February 2014 e-mail, though the plaintiffs do generally assert that the e-mail was only "one egregious example of the general pattern of directors misrepresentation and concealing facts regarding the financial status of the company." Pls.' Br. in Opp'n to Rosenberg's Mot. for Summ. J., dkt. no. 238, at 7.

In short, Rosenberg contends that he acted innocently. The plaintiffs disagree. They impute an evil motive to Rosenberg, pointing to his admissions that he was deeply involved in Ditto's operations during the time period in question to support their contention that Rosenberg intentionally elided his directorial responsibilities in complicity with Joseph Fox's scheme.

## Discussion

### A.    Jurisdiction

The Court must first assess the threshold question of jurisdiction. Though the

parties did not raise it, the Court has an independent responsibility to satisfy itself that it has subject-matter jurisdiction over what remains of this case. *See Baez-Sanchez v. Sessions*, 862 F.3d 628, 941 (7th Cir. 2017). As described previously, this suit originally included three plaintiffs, four defendants, and seven counts. The parties are not of diverse citizenship, and only count 1 arose under federal law. The Court therefore initially exercised federal-question jurisdiction over count 1, *see* 28 U.S.C. § 1331, and opted to retain supplemental jurisdiction over the remaining state-law claims after finding that the they arose from a common nucleus of operative fact, *see Wert*, 2017 WL 3838098, at *1 (citing 28 U.S.C. § 1367(a)). But the Court recently approved a settlement that eliminated the claims against defendant Cohn from the suit, including all of count 1. *See* Order Granting Final Approval of Revised Settlement, dkt. no. 242. It is thus necessary to revisit the question of supplemental jurisdiction.

Section 1367(c)(3) provides that "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) . This language, the Seventh Circuit has recognized, confers broad discretion upon district courts to decide whether to retain supplemental jurisdiction over state-law claims after dismissing the federal claims to which they were initially anchored. *See Walker v. Ingersoll Cutting Tool Co.*, 915 F.3d 1154, 1157 (7th Cir. 2019). In deciding whether to exercise supplemental jurisdiction, "federal courts should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks omitted); *see also RWJ Mgmt. Co. Inc. v. BP Prods. N.*

*Am., Inc.*, 672 F.3d 476, 479-80 (7th Cir. 2012).

The Seventh Circuit has recognized one narrow exception to this broad discretion. Where a plaintiff chooses to amend her complaint to omit the federal claims to which state-law claims were initially tied, supplemental jurisdiction is destroyed. *See Wellness Community-National v. Wellness House*, 70 F.3d 46, 49 (7th Cir. 1995). In *Wellness*, the plaintiff did exactly that. *Id.* The Seventh Circuit explained that "once the First Amended Complaint superseded the original complaint, there was no federal claim to which these state claims could be 'supplemental.'" *Id.* at 50.

The present case, however, is different. Specifically, unlike *Wellness*, the plaintiffs here have not amended the operative complaint to eliminate the federal claim. Rather, as in *Walker*, the Court has dismissed the federal claim—albeit pursuant to a stipulation—and the related state-law claims remain. The Court concludes that it has discretion under 28 U.S.C. § 1367(c)(3) to exercise supplemental jurisdiction over the remaining state-law counts.

The Court also finds it appropriate to exercise its discretionary jurisdiction over the state-law claims that remain in this suit. Based on the stage of litigation and the resources already invested toward resolving this matter, it would be patently inefficient to send the plaintiffs to refile their grievances in state court. The Court is especially sensitive to the considerable discovery and other litigation work completed by the parties and their counsel. Likewise, there are no comity concerns or particularly novel legal questions that would weigh in favor of relinquishing supplemental jurisdiction. Therefore, the Court proceeds to analysis of the remaining state-law claims—counts 2, 3, 4, 5, and 6—against the remaining defendants—Feiner, Avi Fox, and Rosenberg.

**B.     Motions for summary judgment**

Each of the three defendants has moved for summary judgment.  Summary judgment is appropriate where a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At this stage, "[a]ll justifiable inferences are drawn in favor of the non-moving party."  *Giles v. Godinez*, 914 F.3d 1040, 1048 (7th Cir. 2019) (citing *Anderson*, 477 U.S. at 255).  "The non-movant must, however, present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture."  *Id.* (citation omitted).  A non-moving plaintiff cannot survive a motion for summary judgment simply by resting on her pleadings; once the moving party has adequately challenged any element of the plaintiff's claims, the plaintiff "assume[s] the burden to identify specific facts in the record that demonstrate[ ] a genuine issue for trial."  *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 647 (7th Cir. 2011).

**1.     Corporate waste and breach of fiduciary duty under Delaware law (counts 2 and 3)**

Counts 2 and 3 allege related misconduct.  Count 2 alleges corporate waste under Delaware law.  The Delaware Supreme Court has defined corporate waste as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."  *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997)).  "If, however, there is any substantial consideration received by the

corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky." *Id.* (quoting *Vogelstein*, 699 A.2d at 336). The court further explained that judicial intervention is appropriate only in "unconscionable cases where directors irrationally squander or give away corporate assets." *Id.* Delaware law also grants directors full protection from liability where they "rely[] in good faith upon" advice provided by persons, such as lawyers, on matters the director "reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation." Del. Code Ann. tit. 8, § 141(e); *see also Brehm*, 746 A.2d at 261-62

Count 3 alleges that the defendants breached their fiduciary duties to the corporation's shareholders. Delaware law requires a plaintiff to prove two elements to prevail on a breach of fiduciary duty claim: (1) the existence of a fiduciary duty and (2) the defendant's breach of that duty. *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). The fiduciary duty is actually made up of multiple duties. Chief among these are the "fiduciary duties of care and loyalty," which directors "owe to the corporation and its shareholders." *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). But because most of the decisions made by a corporation are "not the subject of director attention," *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996), Delaware law allows for so-called "exculpatory provisions" to be included in corporate charters which "release[] directors from liability for breaches of the duty of care." *In re Tyson Foods, Inc. Consol. Shareholder Litig.*, 919 A.2d 563, 597

(Del. Ch. 2007); *see also Malpiede v. Townson*, 780 A.2d 1075, 1090 (Del. 2001); Del.

Code Ann. tit. 8, § 102(b)7).  Notably, such provisions do not release directors from

personal liability for violations of their duties of loyalty and good faith.  *See Malpiede*,

780 A.2d at 1094.

### a.    Feiner

Feiner moves for summary judgment on counts 2 and 3.  On corporate waste, he

argues that the plaintiffs have failed to point to evidence from which a reasonable jury

could conclude that he was even a member of the Ditto board of directors at the time of

the allegedly wasteful actions described in count 2.  Feiner notes that the lion's share of

the actions described in the plaintiffs' complaint arose from non-party Joseph Fox's

actions before September 2013, when Feiner became a board member.  Feiner asserts

that as a result, he could not possibly have been responsible for the alleged waste.  The

only exception to this general timing, he notes, is his late-2013 vote to authorize Ditto to

pursue a defamation counterclaim against Simons in the lawsuit Simons brought

against Ditto shortly after he was removed from his roles as CEO and director.

The plaintiffs' only explicit discussion of the corporate waste claim comes in a

footnote near the end of their brief.  Although they contest Feiner's characterization of

count 2 as focusing exclusively on his vote to pursue the defamation claim against

Simons, they do not explain what other conduct might support the claim.  Moreover, the

plaintiffs appear to adopt Feiner's focus on the defamation counterclaim by stating that

the "allegation in Count II is based upon the Company's pursuit of the defamation

lawsuit."  Pls.' Br. in Opp'n to Feiner's Mot. for Summ. J., dkt. no. 190, at 15 n.6.  The

plaintiffs go on to assert that the defamation claim against Simons was "frivolous" and

constituted a "wasteful use of corporate funds." *Id.* But they point to no record evidence supporting that contention aside from the fact that judgment was entered against Ditto for failure to prosecute the claim.

As the non-moving parties, the plaintiffs must "present specific facts establishing a material issue for trial." *Giles*, 914 F.3d at 1048. They cannot simply rest on the allegations in their pleadings. *Crawford*, 647 F.3d at 647. Simply asserting, as the plaintiffs do here, that Feiner committed corporate waste by voting to authorize Ditto to pursue a counterclaim against Simons in his suit against the company is inadequate to survive summary judgment. Rather, the plaintiffs must actually point to evidence from which a reasonable jury could conclude that Feiner individually committed corporate waste. They have not done so. Specifically, the plaintiffs' broad gesturing to the judgment against Ditto on the defamation claim does not by itself provide a basis to conclude the claim was frivolous, much less that its pursuit was wasteful. Summary judgment in Feiner's favor on count 2 is therefore appropriate.

Feiner also seeks summary judgment on count 3. He argues that the plaintiffs have not pointed to evidence from which a reasonable jury could conclude that he breached his duties of loyalty and good faith to Ditto. Rather, Feiner contends, the most adverse inference the record supports is that he was inattentive in executing his duties—perhaps even to the point of gross negligence—but not reckless or intentional. Such negligence is, he argues, the sort of relatively minor breach of a director's duty of care that is fully protected by the exculpatory provision in Ditto's charter. Specifically, Feiner points to evidence suggesting that he inquired about the issues identified in the Simons letter and was assured by then-CEO Joseph Fox that they were already being

addressed by the special committee and outside investigation.  Indeed, Feiner suggests that Joseph Fox intentionally prevented him from learning more about Simons's allegations and Ditto's response.  Although it may not have been wise to accept Joseph Fox's reassurances, Feiner argues, this evidence undermines any suggestion of bad faith.

For their part, the plaintiffs argue that liability should sweep more broadly.  They assert that Feiner's misdeeds were so culpable as to be actionable despite the exculpatory clause.  Specifically, they argue that "[i]t is a breach of fiduciary duty for a director to passively allow questionable corporate activity."  Pls.' Br. in Opposition to Feiner's Mot. for Summ. J., dkt. no. 190, at 4.  Plaintiffs cite a raft of Delaware cases that purportedly support this broad proposition.  For instance, they cite *In re INFOUSA, Inc. Shareholder Litigation*, 953 A.2d 963 (Del. Ch. 2007), in which the defendant directors' motion to dismiss was denied where a plaintiff had alleged "literally dozens" of related-party transactions, "each blessed or passively noted by a board of directors with close personal and professional ties to the principal beneficiary of such largess."  *Id.* at 1000.  The court went on to opine that, at the motion to dismiss stage, the plaintiffs were entitled to a "reasonable inference of bad faith due to the efforts taken by defendants to conceal" the nature of those transactions.  *Id.*  The plaintiffs then cite *Ryan v. Gifford*, 935 A.2d 258 (Del. Ch. 2007), which also concerned a motion to dismiss.  In *Ryan*, as in *INFOUSA*, the court held that the plaintiff was entitled to a reasonable inference of bad faith and disloyalty where he had alleged that the defendant director had attempted to conceal the issuance of shady stock options.  *Id.* at 272.  The court was careful to note, however, that its conclusion was based on its obligation to take the plaintiff's allegations

as true at the motion to dismiss stage. *Id.* In short, the cases the plaintiffs cite are unhelpful because they turn on the standard for assessing a motion to dismiss.

The plaintiffs also argue that Feiner's failure to insist on more searching oversight was a breach of his fiduciary duty. Much of their argument misses the mark. For instance, they cite several cases where, unlike here, there was apparently no exculpatory provision in the relevant corporate charter, meaning that mere breaches of the duty of care were sufficient for liability. *See, e.g.*, *ATR-Kim Eng Fin. Corp. v. Araneta*, No. CIV.A. 489-N, 2006 WL 3783520, at *19 (Del. Ch. Dec. 21, 2006). One of the cases they cite does, however, set out the correct standard. In *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006), the Delaware Supreme Court held that directors may be liable for breaching their fiduciary duties where "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Id.* at 370. But, the Delaware Supreme Court cautioned, "[i]n either case, imposition of liability requires a showing that the directors *knew* that they were not discharging their fiduciary obligations." *Id.* (emphasis added).

The crux of the plaintiffs' argument, then, is that Feiner's failure to more vigorously pursue oversight of Ditto's operations was a bad-faith breach of his fiduciary duty under *Stone*. In support, they point primarily to deposition testimony in which Feiner admitted that he joined the Ditto board because he thought it would look good on a resume and that he did not recall being appointed to or attending meetings for Ditto's finance and audit committee despite his signature appearing on its minutes. The

plaintiffs also highlight that Feiner said he never read reports prepared by outside auditors and had no knowledge of the company's accounting procedures.

Ultimately, however, none of the evidence on which the plaintiffs rely supports an inference of knowledge. *See Stone*, 911 A.2d at 370. That is, although they argue vigorously that Feiner's absenteeism ought not to be a bulwark against liability, the plaintiffs have not actually raised specific evidence from which a reasonable jury could conclude, as required by *Stone*, that Feiner knew that he was not discharging his fiduciary duties during his time as a director. Indeed, the plaintiffs point to contrary evidence, including Feiner's testimony that he had never before served on a corporate board, had not done any work ahead of time to find out what the position would entail, and did not consult with an attorney on the topic. Although such evidence may support an inference that Feiner was a bad director, it is insufficient to show the sort of knowing, bad-faith breach necessary for liability to attach despite the charter's exculpatory provision. *See Malpiede*, 780 A.2d at 1090.

To survive a motion for summary judgment, the plaintiffs must produce evidence—not mere allegations—from which a reasonable jury could conclude that that the defendant director acted in bad faith. *Crawford*, 647 F.3d at 647. The plaintiffs have failed to do so. Feiner is entitled to summary judgment on count 3.

### b. Avi Fox

Avi Fox seeks partial summary judgment on counts 2 and 3. Specifically, he requests summary judgment on the portion of the claims involving matters after December 2012, when he says that he left the Ditto board to undergo leukemia treatment. The implications of such a motion, if granted, would be the elimination of

Myers's claims, because he did not purchase Ditto stock until 2015, and a significant limitation of Wert and Kincaid's claims. In support of his motion, Avi Fox points to (1) his own testimony; (2) a letter from one of his physicians describing his diagnosis and its approximate timing; (3) an e-mail sent by Joseph Fox on December 27, 2012 to shareholders announcing the candidates for the Ditto board of directors that did not include Avi Fox's name; and (4) an e-mail sent by Joseph Fox to plaintiff Wert in July 2013 discussing Avi Fox's leukemia diagnosis and treatment. Rosenberg's deposition testimony also corroborates Avi Fox's representations regarding the timing of his departure from the board. *See* Rosenberg Dep., Ex. D to Pls.' L.R. 56.1 Stat., dkt. no. 239-4, at 72:19-22; 73:1-9.

In opposition to Fox's motion, the plaintiffs argue that the timing of his departure from the board is a disputed material fact. Citing bank records and Avi Fox's filings in this suit, they contend that he continued to seek and receive payment from Ditto in 2013 and 2014, long after he says he departed the board. In the plaintiffs' words, "if Avi was paid by the company for periods occurring after his supposed complete departure, then he cannot escape liability from Plaintiffs' claims as a matter of law." Pls.' Br. in Opp'n to Avi Fox's Mot. for Partial Summ. J., dkt. no. 235, at 8. They also suggest that Avi Fox's inability during his deposition to recall certain details about his departure supports an inference that he never really left the board.

The plaintiffs overstate their case. The key question, after all, is whether there is evidence from which a reasonable jury could conclude that Avi Fox was a member of Ditto's board of directors after he says he left, not whether he was still receiving benefits from Ditto or whether he could recall certain details of his departure. To be sure, the

plaintiffs have provided unrebutted evidence that Avi Fox received checks from Ditto after he says he left the board. But they have pointed to nothing that would allow a reasonable inference that he remained a *member of the board* after he says he departed to undergo intensive leukemia treatment. Indeed, all of the record evidence outlined here supports the contrary conclusion: that Avi Fox left the board of directors in December 2012. No reasonable jury could not find for the plaintiffs on this point.

On a motion for summary judgment, the plaintiffs are no longer entitled to a presumption that their allegations are true. Rather, they must "identify specific facts in the record that demonstrate[ ] a genuine issue for trial." *Crawford*, 647 F.3d at 647. The plaintiffs have failed to do so. The Court therefore grants Avi Fox's motion for partial summary judgment on counts 2 and 3.

### c. Rosenberg

Rosenberg also moves for summary judgment on counts 2 and 3. His arguments bear some similarity to Feiner's, but he admits to having been more heavily involved with Ditto's corporate governance during the relevant time period.

On count 2, which alleges corporate waste, Rosenberg contends that there is no evidence suggesting that he ever intentionally or irrationally squandered Ditto's corporate assets. *Cf. Brehm*, 746 A.2d at 263 ("To be sure, there are outer limits, but they are confined to unconscionable cases where directors irrationally squander or give away corporate assets."). Indeed, he argues, record evidence supports the conclusion that he acted in good faith to protect the shareholders by, among other actions, convening a special committee to investigate the allegations in the Simons letter and by retaining Goldberg Kohn to conduct an investigation of Ditto's management. Rosenberg

contends that he did not have did not have access to certain important information—including Ditto's financial records—until the formation of the special committee. Only then, Rosenberg says, did he become aware that the company's chief financial officer, Jeremy Mann, was significantly behind on his recordkeeping obligations. Rosenberg says that once he had the authority, he repeatedly questioned Mann about the company's bookkeeping practices. Rosenberg has further testified that he reported the issue to Ditto's CEO, Joseph Fox, and followed up with Mann repeatedly over the following months.

In opposition to Rosenberg's motion for summary judgment, the plaintiffs point to this Court's previous ruling in which it noted that "Delaware courts have categorized allegations of corporate waste as involving bad faith." *See Wert*, 2017 WL 3838098, at *12. The Court noted that, as such, the exculpatory provision in Ditto's charter was not enough to defeat allegations of corporate waste on a motion to dismiss, where plaintiffs' allegations must be taken as true. *See id.* The plaintiffs go on to argue that "Rosenberg has presented no record evidence that would result in a different outcome now." Pls.' Br. in Opp'n to Rosenberg's Mot. for Summ. J., dkt. no. 238, at 11.

The plaintiffs' argument distorts the summary judgment standard. As the Court has now stated several times, once the moving party has raised doubts regarding necessary elements of the plaintiff's claims—here, Rosenberg's citations to record evidence suggesting he acted diligently and was not complicit in any wasteful behavior perpetrated by Joseph Fox—the plaintiffs "assume the burden" of supporting them with evidence. *Crawford*, 647 F.3d 647. In other words, the plaintiffs' efforts to shift the

burden back to Rosenberg to actively disprove their allegations is unsupported by law. Because Delaware law requires the plaintiffs to ultimately demonstrate that Rosenberg "irrationally squander[ed] or g[a]ve away corporate assets," *Brehm*, 746 A.2d at 263, and because they have failed to point to evidence from which a reasonable jury could conclude he did so, Rosenberg is entitled to summary judgment on count 2.

Rosenberg's motion for summary judgment on count 3 sounds many notes familiar from the discussion of Feiner's motion. In short, he argues that the he did not act in bad faith or breach his duty of loyalty and that any potential breach of his duty of care is protected by the Ditto charter's exculpatory provision. Rosenberg again points to his own testimony and other evidence that he acted diligently and to the best of his ability to address problems facing the Ditto board as he became aware of them. He contends that his ability to protect shareholders was limited, however, by Joseph Fox's withholding of certain important information. The plaintiffs argue that Rosenberg knew Ditto was being looted and looked the other way. In support of this position, they point to Rosenberg's testimony that he was aware of some potentially shady dealings, including Joseph Fox's compensation scheme—pursuant to which Joseph Fox was paid large advances, which he could then treat as a loan or salary at his discretion—but did nothing to stop them.

To prevail on this motion in light of the exculpatory provision, the plaintiffs must point to evidence from which a reasonable jury could conclude that Rosenberg "knew that [he was] not discharging [his] fiduciary obligations." *Stone*, 911 A.2d 370. After carefully reviewing the parties' submissions and the record, the Court concludes that the evidence supports, at most, a reasonable inference that Rosenberg acted with gross

negligence, not knowing conduct. The plaintiffs simply have not pointed to evidence supporting a reasonable inference that any failure on Rosenberg's part was knowing, intentional, or in bad faith, as is required for liability to attached despite the Ditto charter's exculpatory clause. *See Malpiede*, 780 A.2d at 1090. Perhaps Rosenberg should have concluded that Joseph Fox's management of the company was problematic before he became aware of Simons's letter. But uncontested evidence that Rosenberg responded when confronted with shareholder concerns about Joseph Fox's management fundamentally undermines an inference that Rosenberg intentionally or willfully flouted his fiduciary duties. Moreover, as discussed further below, unlike many of the cases cited by the plaintiffs, there is no competent evidence supporting a reasonable inference that Rosenberg actively attempted to conceal Joseph Fox's misdeeds. *Cf. Ryan*, 935 A.2d at 272 (discussing the importance of concealment to the analysis). Rosenberg is thus entitled to summary judgment on count 3.

### 2. Fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation under Illinois law (counts 4, 5 and 6)

The remaining claims allege various forms of misrepresentation and concealment under Illinois law. Count 4 alleges fraudulent misrepresentation. Under Illinois law, a plaintiff must prove the following elements to prevail on a claim for fraud: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co*., 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996). To win on fraudulent concealment—the allegation in count 5—a plaintiff may rely on an intentional omission (rather than a statement) but must additionally show that

the defendant "concealed a material fact when he was under a duty to disclose that fact" to the plaintiff. *Vandenberg v. Brunswick Corp.*, 2017 IL App (1st) 170181, ¶ 31, 90 N.E.3d 1048, 1056. Finally, claim 6 alleges negligent misrepresentation. A claim of negligent misrepresentation shares many of the same elements as a fraudulent misrepresentation claim. *Bd. of Educ. v. A, C & S, Inc.*, 131 Ill. 2d 428, 452, 546 N.E.2d 580, 591 (1989). The difference is that for negligent misrepresentation, the defendant need not know that the statement in question is false; "[h]is own carelessness or negligence in ascertaining its truth will suffice." *Id.*

Each of the defendants has moved for summary judgment on claims 4, 5, and 6. Feiner and Rosenberg's motions can be addressed simultaneously because the arguments are materially identical. Both defendants argue that they cannot be liable under counts 4 and 6 because each requires "a false statement of material fact." There is no evidence, they contend, that they ever had any sort of direct communication with— much less made any false statements to—the plaintiffs. They also argue that they are entitled to summary judgment on count 5 because there is no evidence from which a reasonable jury could conclude that any information they failed to disclose to the plaintiffs was omitted with the requisite intent.

In opposition to the motions, the plaintiffs advance two theories. First, they argue that whether the defendants made actionable false statements is disputed and thus precludes summary judgment. Specifically, they assert that the e-mail to shareholders that downplayed the significance of the Goldberg Kohn report—described above— contained materially false statements signed by the defendants. But Rosenberg and Feiner both testified that the e-mail was a draft circulated by outside counsel and was

never actually sent to shareholders.  And, as the defendants correctly observe, there is no direct evidence suggesting that the e-mail upon which the plaintiffs rely was ever actually sent to shareholders.

To support their assertion that the e-mail was circulated, the plaintiffs rely solely on plaintiff Myers's testimony from his deposition that two other shareholders told him that they may have received the e-mail.  *See, e.g.*, Myers Dep., Ex C. to Pls.' Br. in Opp'n to Feiner's Mot. for Summ. J., dkt. no. 239-3, at 172:8-12.  As plaintiffs all but acknowledge in their briefs, however, that testimony is clearly inadmissible hearsay. *See* Fed. R. Evid. 801(c).  "[A] court may consider only admissible evidence in assessing a motion for summary judgment."  *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).  Because the plaintiffs' first theory is predicated exclusively on inadmissible evidence, it must be rejected.

The plaintiffs' second theory for liability against Feiner and Rosenberg rests on alleged material omissions.  Specifically, they argue that collective allegations against corporate boards as a whole are sufficient to state a claim against individual directors. This contention fails for two reasons.  First, the cases the plaintiffs cite are about real-time failures of individual board members to correct statements by fellow board members that they knew to be false, *see, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010), and are thus readily distinguishable.  Here, there is no evidence—indeed, there is not even an allegation—that Feiner and Rosenberg were present for any of the specific misrepresentations that the plaintiffs allege.  For instance, the complaint alleges that Joseph Fox and Stuart Cohn made false statements to Myers at a meeting attended by only the three of them.  Rosenberg and Feiner thus

did not have the sort of clear opportunity and responsibility to correct the misrepresentations that would allow for individual liability to attach based on a *failure* to make a statement. *Cf. In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (D. Ohio 2000) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context.").

The more fundamental flaw with the plaintiffs' second theory, however, is that it seeks to apply the motion to dismiss standard to this motion for summary judgment. For instance, the plaintiffs characterize the Court's summary, from a previous order, of the allegations in the complaint—that the defendants were aware of false statements made to shareholders but failed to correct the falsehoods—as "the Court's ruling," Pls.' Br. in Opp'n to Feiner's Mot. for Summ. J., dkt. no. 193, at 8; Pls.' Br. in Opp'n to Rosenberg's Mot. for Summ. J., dkt. no. 238, at 7, before scolding Rosenberg and Feiner for failing to refute the Court's summary. The plaintiffs then go on to cite several cases applying the standard applicable to fraud claims against corporate directors at the motion to dismiss stage. For instance, in *O'Donoghue v. Inland Bank and Trust*, No. 15 C 11603, 2017 WL 5891199 (N.D. Ill. Nov. 27, 2017), Judge Ellis permitted a case to proceed past a motion to dismiss where the plaintiff had successfully alleged that the defendant corporate directors had "as a whole participated and assisted in perpetrating a fraud" under the "group pleading" doctrine. *Id.* at *6.

Despite the plaintiffs' repeated errant citations to case law involving motions to dismiss, the motions before the Court are for summary judgment. Thus the Court is no

longer permitted to presume the truth of the plaintiffs' allegations. Nor, for obvious reasons, does this Court's summary of the plaintiffs' allegations in its order on the motions to dismiss somehow establish those allegations as facts for the purpose of the motion for summary judgment. Likewise, the "group *pleading*" doctrine described in *O'Donoghue* has no application at this stage. The question is no longer whether the plaintiffs have successfully pleaded their claims but rather whether they have produced evidence from which a reasonable jury could find in their favor.

As is always the case on a motion for summary judgment, the non-moving plaintiffs must "present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture." *Giles*, 914 F.3d at 1048 (citation omitted). The plaintiffs have failed to produce evidence sufficient for a reasonable jury to conclude that Feiner or Rosenberg made false statements or omissions of material fact sufficient to satisfy the first elements of counts 4, 5 and 6. The Court therefore grants summary judgment in favor of Rosenberg and Feiner on those claims.

Finally, Avi Fox's motion also seeks summary judgment on counts 4, 5, and 6. Although styled as "partial," it is clear that Avi Fox seeks judgment on the entirety of these three claims. *See* Br. in Supp. of Avi Fox's Mot. for Summ. J., dkt. no. 222, at 3, 5. Specifically, he asserts that there is no record evidence to support the conclusion that he ever made any statements or omissions—misleading or otherwise—to the plaintiffs because he was no longer a member of the board of directors after December 2012. Although Avi Fox's board membership is not, the Court notes, dispositive on these counts, the plaintiffs' total failure to point to evidence of any statements or

omissions made by him to the plaintiffs is. The plaintiffs again seek to rest on the allegation in their second amended complaint that Avi Fox sought to conceal aspects of the company's management that were material to shareholders' investment decisions. *See, e.g.*, Pls.' Br. in Opp'n to Avi Fox's Mot. for Partial Summ. J., dkt. no. 235, at 12 (citing 2d Am. Compl., dkt. no. 93, at ¶¶ 31-32). The plaintiffs must present evidence from which jury can find in their favor in for a claim to survive summary judgment. They have failed to do so. Avi Fox is therefore entitled to summary judgment on counts 4, 5, and 6.

## Conclusion

For the foregoing reasons, the Court grants Feiner's motion for summary judgment [dkt. no. 180], Avi Fox's motion for partial summary judgment [dkt. no. 222], and Rosenberg's motion for summary judgment [dkt. no. 225]. The case is set for a status hearing on April 22, 2019 at 9:30 a.m. to set a schedule for any further proceedings required to bring the remainder of the case to a conclusion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 12, 2019